## SOUTHEASTERN PROMOTIONS, LTD. *v.* CONRAD
### ET AL.

No. 73–1004.   Argued October 17, 1974—Decided March 18, 1975

*Henry P. Monaghan* argued the cause for petitioner. With him on the brief was *John Alley.*

*Randall L. Nelson* argued the cause for respondents. With him on the brief was *Eugene N. Collins.**

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The issue in this case is whether First Amendment rights were abridged when respondents denied petitioner the use of a municipal facility in Chattanooga, Tenn., for the showing of the controversial rock musical "Hair." It is established, of course, that the Fourteenth Amendment has made applicable to the States the First Amendment's guarantee of free speech. *Douglas* v. *City of Jeannette,* 319 U. S. 157, 162 (1943).

I

Petitioner, Southeastern Promotions, Ltd., is a New York corporation engaged in the business of promoting and presenting theatrical productions for profit. On October 29, 1971, it applied for the use of the Tivoli, a privately owned Chattanooga theater under long-term lease to the city, to present "Hair" there for six days beginning November 23. This was to be a road company showing of the musical that had played for three

---

*\*Irwin Karp* filed a brief for the Authors League of America, Inc., as *amicus curiae* urging reversal.

years on Broadway, and had appeared in over 140 cities in the United States.[1]

Respondents are the directors of the Chattanooga Memorial Auditorium, a municipal theater.[2] Shortly after receiving Southeastern's application, the directors met, and, after a brief discussion, voted to reject it. None of them had seen the play or read the script, but they understood from outside reports that the musical, as produced elsewhere, involved nudity and obscenity on stage. Although no conflicting engagement was scheduled for the Tivoli, respondents determined that the production would not be "in the best interest of the community." Southeastern was so notified but no written statement of reasons was provided.

On November 1 petitioner, alleging that respondents' action abridged its First Amendment rights, sought a pre-

---

[1] Twice previously, petitioner informally had asked permission to use the Tivoli, and had been refused. In other cities, it had encountered similar resistance and had successfully sought injunctions ordering local officials to permit use of municipal facilities. See *Southeastern Promotions, Ltd.* v. *City of Mobile,* 457 F. 2d 340 (CA5 1972); *Southeastern Promotions, Ltd.* v. *City of West Palm Beach,* 457 F. 2d 1016 (CA5 1972); *Southeastern Promotions, Ltd.* v. *Oklahoma City,* 459 F. 2d 282 (CA10 1972); *Southeastern Promotions, Ltd.* v. *City of Charlotte,* 333 F. Supp. 345 (WDNC 1971); *Southeastern Promotions, Ltd.* v. *City of Atlanta,* 334 F. Supp. 634 (ND Ga. 1971). See also *P. B. I. C., Inc.* v. *Byrne,* 313 F. Supp. 757 (Mass. 1970), vacated and remanded for further consideration, 413 U. S. 905 (1973). But see *Southeastern Promotions, Ltd.* v. *Oklahoma City,* Civil Action No. 72–105 (WD Okla. Mar. 27, 1972), rev'd, 459 F. 2d 282, *supra.*

The musical had been presented in two Tennessee cities, Memphis and Nashville.

[2] Code of the city of Chattanooga § 2–238. The board's members are appointed by the mayor and confirmed by the city's board of commissioners. § 2–237. The chairman, respondent Conrad, is commissioner of public utilities, grounds, and buildings. § 2–236.

liminary injunction from the United States District Court for the Eastern District of Tennessee. Respondents did not then file an answer to the complaint.[3]   A hearing was held on November 4.   The District Court took evidence as to the play's content, and respondent Conrad gave the following account of the board's decision:

> "We use the general terminology in turning down the request for its use that we felt it was not in the best interest of the community and I can't speak beyond that.   That was the board's determination.
>
> "Now, I would have to speak for myself, the policy to which I would refer, as I mentioned, basically indicates that we will, as a board, allow those productions which are clean and healthful and culturally uplifting, or words to that effect.   They are quoted in the original dedication booklet of the Memorial Auditorium."   App. 25.[4]

The court denied preliminary relief, concluding that petitioner had failed to show that it would be irreparably

---

[3] Neither did it file at that time a formal motion to dismiss.   That motion was made later, on November 22, some time after the initial hearing.   An answer was finally filed, pursuant to court order, on March 31, 1972.

[4] The Memorial Auditorium, completed in 1924, was dedicated to the memory of Chattanooga citizens who had "offered their lives" in World War I.   The booklet referred to is entitled Souvenir of Dedication of Soldiers & Sailors Auditorium Chattanooga, Tenn. It contains the following:

"It will be [the board's] endeavor to make [the auditorium] the community center of Chattanooga; where civic, educational, religious, patriotic and charitable organizations and associations may have a common meeting place to discuss and further the upbuilding and general welfare of the city and surrounding territory.

"It will not be operated for profit, and no effort to obtain financial returns above the actual operating expenses will be permitted. Instead its purpose will be devoted for cultural advancement, and for clean, healthful, entertainment which will make for the upbuilding of a better citizenship."   Exhibit 2, p. 40.

harmed pending a final judgment since scheduling was "purely a matter of financial loss or gain" and was compensable.

Southeastern some weeks later pressed for a permanent injunction permitting it to use the larger auditorium, rather than the Tivoli, on Sunday, April 9, 1972. The District Court held three days of hearings beginning April 3. On the issue of obscenity *vel non,* presented to an advisory jury, it took evidence consisting of the full script and libretto, with production notes and stage instructions, a recording of the musical numbers, a souvenir program, and the testimony of seven witnesses who had seen the production elsewhere. The jury returned a verdict that "Hair" was obscene. The District Court agreed. It concluded that conduct in the production—group nudity and simulated sex—would violate city ordinances and state statutes [5] making public nudity and

---

[5] Chattanooga Code:

"Sec. 6-4. Offensive, indecent entertainment.

"It shall be unlawful for any person to hold, conduct or carry on, or to cause or permit to be held, conducted or carried on any motion picture exhibition or entertainment of any sort which is offensive to decency, or which is of an obscene, indecent or immoral nature, or so suggestive as to be offensive to the moral sense, or which is calculated to incite crime or riot."

"Sec. 25-28. Indecent exposure and conduct.

"It shall be unlawful for any person in the city to appear in a public place in a state of nudity, or to bathe in such state in the daytime in the river or any bayou or stream within the city within sight of any street or occupied premises; or to appear in public in an indecent or lewd dress, or to do any lewd, obscene or indecent act in any public place."

Tennessee Code Ann. (Supp. 1971):

"39-1013. Sale or loan of material to minor—Indecent exhibits.—It shall be unlawful:

"(a) for any person knowingly to sell or loan for monetary consideration or otherwise exhibit or make available to a minor:

"(1) any picture, photograph, drawing, sculpture, motion picture

obscene ,acts criminal offenses.[6]   This criminal conduct, the court reasoned, was neither speech nor symbolic speech, and was to be viewed separately from the musi-

film, or similar visual representation or image of a person or portion of the human body, which depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors;

"(2) any book, pamphlet, magazine, printed matter, however reproduced, or sound recording, which contains any matter enumerated in paragraph (1) hereof above, or which contains explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors;

"(b) for any person knowingly to exhibit to a minor for a monetary consideration, or knowingly to sell to a minor an admission ticket or pass or otherwise to admit a minor to premises whereon there is exhibited a motion picture, show or other presentation which, in whole or in part, depicts nudity, sexual conduct, excess violence, or sado-masochistic abuse, and which is harmful to minors."

"39–3003.  Obscene material—Knowingly selling, distributing or exhibiting—Penalty.—It shall be a misdemeanor for any person to knowingly sell, distribute, display, exhibit, possess with the intent to sell, distribute, display or exhibit; or to publish, produce, or otherwise create with the intent to sell, distribute, display or exhibit any obscene material."

Subsequent to our grant of the petition for certiorari in this case, the Supreme Court of Tennessee held that § 39–3007 of the Tennessee Code, which defined "obscene material," as those words were used in § 39–3003 and related sections, was unconstitutional for failure to satisfy the specificity requirements of *Miller* v. *California,* 413 U. S. 15 (1973). *Art Theater Guild, Inc.* v. *State ex rel. Rhodes,* 510 S. W. 2d 258 (1974). Thereafter, a new obscenity statute, Acts 1974 (Adj. S), c. 510, was enacted by the Tennessee Legislature; § 14 of that act specifically repealed the above quoted § 39–3003.

[6] Respondents also contended that production of the musical would violate the standard lease that petitioner would be required to sign. The relevant provision of that lease reads:

"This agreement is made and entered into upon the following express covenants and conditions, all and every one of which the lessee hereby covenants and agrees to and with the lessor to keep and perform:

"1. That said lessee will comply with all laws of the United States

cal's speech elements. Being pure conduct, comparable to rape or murder, it was not entitled to First Amendment protection. Accordingly, the court denied the injunction, 341 F. Supp. 465 (1972).

On appeal, the United States Court of Appeals for the Sixth Circuit, by a divided vote, affirmed. 486 F. 2d 894 (1973). The majority relied primarily on the lower court's reasoning. Neither the judges of the Court of Appeals nor the District Court saw the musical performed. Because of the First Amendment overtones, we granted certiorari. 415 U. S. 912 (1974).

Petitioner urges reversal on the grounds that (1) respondents' action constituted an unlawful prior restraint, (2) the courts below applied an incorrect standard for the determination of the issue of obscenity *vel non,* and (3) the record does not support a finding that "Hair" is obscene. We do not reach the latter two contentions, for we agree with the first. We hold that respondents' rejection of petitioner's application to use this public forum accomplished a prior restraint under a system lacking in constitutionally required minimal procedural safeguards. Accordingly, on this narrow ground, we reverse.

## II

Respondents' action here is indistinguishable in its censoring effect from the official actions consistently identified as prior restraints in a long line of this Court's decisions. See *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969); *Staub* v. *City of Baxley,* 355 U. S. 313, 322 (1958); *Kunz* v. *New York,* 340 U. S. 290, 293–294 (1951); *Schneider* v. *State,* 308 U. S. 147, 161–162

and of the State of Tennessee, all ordinances of the City of Chattanooga, and all rules and requirements of the police and fire departments or other municipal authorities of the City of Chattanooga." Exhibit 3.

(1939); *Lovell* v. *Griffin*, 303 U. S. 444, 451–452 (1938). In these cases, the plaintiffs asked the courts to provide relief where public officials had forbidden the plaintiffs the use of public places to say what they wanted to say. The restraints took a variety of forms, with officials exercising control over different kinds of public places under the authority of particular statutes. All, however, had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.

Invariably, the Court has felt obliged to condemn systems in which the exercise of such authority was not bounded by precise and clear standards. The reasoning has been, simply, that the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use. Our distaste for censorship—reflecting the natural distaste of a free people—is deep-written in our law.

In each of the cited cases the prior restraint was embedded in the licensing system itself, operating without acceptable standards. In *Shuttlesworth* the Court held unconstitutional a Birmingham ordinance which conferred upon the city commission virtually absolute power to prohibit any "parade," "procession," or "demonstration" on streets or public ways. It ruled that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." 394 U. S., at 150–151. In *Hague* v. *CIO*, 307 U. S. 496 (1939), a Jersey City ordinance that forbade public assembly in the streets or parks without a permit from the local director of safety, who was empowered to refuse the permit upon his opinion that he would thereby prevent " 'riots, disturbances or disorderly

assemblage,' " was held void on its face. *Id.*, at 516 (opinion of Roberts, J.).

In *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), a unanimous Court held invalid an act which proscribed the solicitation of money or any valuable thing for "any alleged religious, charitable or philanthropic cause" unless that cause was approved by the secretary of the public welfare council. The elements of the prior restraint were clearly set forth:

> "It will be noted, however, that the Act requires an application to the secretary of the public welfare council of the State; that he is empowered to determine whether the cause is a religious one, and that the issue of a certificate depends upon his affirmative action. If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id.,* at 305.

The elements of prior restraint identified in *Cantwell* and other cases were clearly present in the system by which the Chattanooga board regulated the use of its theaters. One seeking to use a theater was required to apply to the board. The board was empowered to determine whether the applicant should be granted permission—in effect, a license or permit—on the basis of its review of the content of the proposed production. Approval of the application depended upon the board's affirmative action. Approval was not a matter of routine; instead, it involved the "appraisal of facts, the exercise of judgment, and the formation of an opinion" by the board.[7]

---

[7] With respect to petitioner's musical, respondents' determination was that the production would not be "in the best interest of

The board's judgment effectively kept the musical off stage. Respondents did not permit the show to go on and rely on law enforcement authorities to prosecute for anything illegal that occurred. Rather, they denied the application in anticipation that the production would violate the law. See *New York Times Co.* v. *United States,* 403 U. S. 713, 735–738 (1971) (WHITE, J., concurring).

Respondents' action was no less a prior restraint because the public facilities under their control happened to be municipal theaters. The Memorial Auditorium and the Tivoli were public forums designed for and dedicated to expressive activities. There was no question as to the usefulness of either facility for petitioner's production. There was no contention by the board that these facilities could not accommodate a production of this size. None of the circumstances qualifying as an established exception to the doctrine of prior restraint was present. Petitioner was not seeking to use a facility primarily serving a competing use. See, *e. g., Cameron* v. *Johnson,* 390 U. S. 611 (1968); *Adderley* v. *Florida,* 385 U. S. 39 (1966); *Brown* v. *Louisiana,* 383 U. S. 131 (1966). Nor was rejection of the application based on any regulation of time, place, or manner related to the nature of the facility or applications from other users. See *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941); *Poulos* v. *New Hampshire,* 345 U. S. 395, 408 (1953). No rights

---

the community." That determination may have been guided by other criteria: (1) their own requirement, in the words of respondent Conrad, that a production be "clean and healthful and culturally uplifting," App. 25; or (2) the provisions of the statutes and ordinances prohibiting public nudity and obscenity. Whether or not their exercise of discretion was sufficiently controlled by law, *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969), there can be no doubt that approval of an application required some judgment as to the content and quality of the production.

of individuals in surrounding areas were violated by noise or any other aspect of the production. See *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). There was no captive audience. See *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 304, 306–308 (1974); *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467–468 (1952) (DOUGLAS, J., dissenting).

Whether petitioner might have used some other, privately owned, theater in the city for the production is of no consequence. There is reason to doubt on this record whether any other facility would have served as well as these, since none apparently had the seating capacity, acoustical features, stage equipment, and electrical service that the show required. Even if a privately owned forum had been available, that fact alone would not justify an otherwise impermissible prior restraint. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State,* 308 U. S., at 163.

Thus, it does not matter for purposes of this case that the board's decision might not have had the effect of total suppression of the musical in the community. Denying use of the municipal facility under the circumstances present here constituted the prior restraint.[8]

---

[8] Also important, though unessential to our conclusion, are the classificatory aspects of the board's decision. A licensing system need not effect total suppression in order to create a prior restraint. In *Interstate Circuit* v. *Dallas,* 390 U. S. 676, 688 (1968), it was observed that the evils attendant on prior restraint "are not rendered less objectionable because the regulation of expression is one of classification rather than direct suppression." In that case, the Court held that a prior restraint was created by a system whereby an administrative board in Texas classified films as "suitable for young persons" or "not suitable for young persons." The "not suitable" films were not suppressed, but exhibitors were required to have

That restraint was final. It was no mere temporary bar while necessary judicial proceedings were under way.[9]

Only if we were to conclude that live drama is unprotected by the First Amendment—or subject to a totally different standard from that applied to other forms of expression—could we possibly find no prior restraint here. Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 503 (1952); see *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367 (1969). By its nature, theater usually is the acting out—or singing out—

special licenses and to advertise their classification in order to show them. Similarly, in *Bantam Books, Inc.* v. *Sullivan*, 372 U. S. 58 (1963), the Court held that a system of "informal censorship" working by exhortation and advice sufficiently inhibited expression to constitute a prior restraint and warrant injunctive relief. There, the Court held unconstitutional a system in which a commission was charged with reviewing material "manifestly tending to the corruption of the youth"; it did not have direct regulatory or suppressing functions, but operated by persuasion and intimidation, and these informal methods were found effective.

In the present case, the board classified the musical as unfit for showing in municipal facilities. It did not make a point of publicizing its finding that "Hair" was not in the "best interest" of the public, but the classification stood as a warning to all concerned, private theater owners and general public alike. There is little in the record to indicate the extent to which the board's action may have affected petitioner's ability to obtain a theater and attract an audience. The board's classification, whatever the magnitude of its effect, was not unlike that in *Interstate Circuit* and *Bantam Books*.

[9] This case is clearly distinguishable from *Heller* v. *New York*, 413 U. S. 483 (1973). There, state authorities seized a copy of a film, temporarily, in order to preserve it as evidence. *Id.*, at 490. The Court held that there was not "any form of 'final restraint,' in the sense of being enjoined from exhibition or threatened with destruction." *Ibid.* Here, the board did not merely detain temporarily a copy of the script or libretto for the musical. Respondents reached a final decision to bar performance.

of the written word, and frequently mixes speech with live action or conduct. But that is no reason to hold theater subject to a drastically different standard. For, as was said in *Burstyn, supra,* at 503, when the Court was faced with the question of what First Amendment standard applies to films:

> "[T]he basic principles of freedom of speech and the press, like the First Amendment's command, do not vary. Those principles, as they have frequently been enunciated by this Court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule."

### III

Labeling respondents' action a prior restraint does not end the inquiry. Prior restraints are not unconstitutional *per se.* *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 n. 10 (1963). See *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 716 (1931); *Times Film Corp.* v. *Chicago,* 365 U. S. 43 (1961). We have rejected the contention that the First Amendment's protection "includes complete and absolute freedom to exhibit, at least once, any and every kind of motion picture . . . even if this film contains the basest type of pornography, or incitement to riot, or forceful overthrow of orderly government . . . ." *Id.,* at 46–47.

Any system of prior restraint, however, "comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S., at 70; *New York Times Co.* v. *United States,* 403 U. S., at 714; *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 419 (1971); *Carroll* v. *Princess Anne,* 393 U. S. 175, 181 (1968); *Near* v. *Minnesota ex rel. Olson,* 283 U. S., at 716. The presumption against prior restraints is heavier—and the degree of protection

broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable. See *Speiser* v. *Randall,* 357 U. S. 513 (1958).

In order to be held lawful, respondents' action, first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, and, second, must have been accomplished with procedural safeguards that reduce the danger of suppressing constitutionally protected speech. *Bantam Books, Inc.* v. *Sullivan,* 372 U. S., at 71. We do not decide whether the performance of "Hair" fits within such an exception or whether, as a substantive matter, the board's standard for resolving that question was correct, for we conclude that the standard, whatever it may have been, was not implemented by the board under a system with appropriate and necessary procedural safeguards.

The settled rule is that a system of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman* v. *Maryland,* 380 U. S. 51, 58 (1965). See *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 367 (1971); *Blount* v. *Rizzi,* 400 U. S. 410, 419–421 (1971); *Teitel Film Corp.* v. *Cusack,* 390 U. S. 139, 141–142 (1968). See also *Heller* v. *New York,* 413 U. S. 483, 489–490 (1973); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S., at 70–71; *Kingsley Books, Inc.* v. *Brown,* 354 U. S. 436 (1957). In *Freedman* the Court struck down a state scheme for the licensing of motion pictures, holding "that, because only a

judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." 380 U. S., at 58. We held in *Freedman,* and we reaffirm here, that a system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured.

Although most of our cases have pertained to motion picture licensing or censorship, this Court has applied *Freedman* to the system by which federal customs agents seize imported materials, *United States* v. *Thirty-seven Photographs, supra,* and to that by which postal officials restrict use of the mails, *Blount* v. *Rizzi, supra.* In *Blount* we held unconstitutional provisions of the postal laws designed to control use of the mails for commerce in obscene materials. The provisions enabled the Postmaster General to halt delivery of mail to an individual and prevent payment of money orders to him. The administrative order became effective without judicial approval, and the burden of obtaining judicial review was placed upon the user.

If a scheme that restricts access to the mails must furnish the procedural safeguards set forth in *Freedman,* no less must be expected of a system that regulates use of a public forum. Respondents here had the same powers of licensing and censorship exercised by postal officials in *Blount,* and by boards and officials in other cases.

The theory underlying the requirement of safeguards is applicable here with equal if not greater force. An administrative board assigned to screening stage produc-

tions—and keeping off stage anything not deemed culturally uplifting or healthful—may well be less responsive than a court, an independent branch of government, to constitutionally protected interests in free expression.[10] And if judicial review is made unduly onerous, by reason of delay or otherwise, the board's determination in practice may be final.

Insistence on rigorous procedural safeguards under these circumstances is "but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks." *Bantam Books, Inc.* v. *Sullivan,* 372 U. S., at 66. Because the line between unconditionally guaranteed speech and speech that may be legitimately regulated is a close one, the "separation of legitimate from illegitimate speech calls for . . . sensitive tools." *Speiser* v. *Randall,* 357 U. S., at 525. The perils of prior restraint are well illustrated by this case, where neither the Board nor the lower courts could have known precisely the extent of nudity or simulated sex in the musical, or even that either would appear, before the play was actually performed.[11]

Procedural safeguards were lacking here in several respects. The board's system did not provide a procedure for prompt judicial review. Although the District Court commendably held a hearing on petitioner's motion for a preliminary injunction within a few days of the

---

[10] See Monaghan, First Amendment "Due Process," 83 Harv. L. Rev. 518, 522–524 (1970); Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp. Prob. 648, 656–659 (1955).

[11] There was testimony that the musical as performed differed "substantially" from the script, App. 79–80, and that the show was varied to fit the anticipated tastes of different audiences in different parts of the country. *Id.,* at 93. The musical's nude scene, apparently the most controversial portion, was played under varying conditions. No actor was under contractual obligation to perform it, and the number doing so changed from one performance to another, as did the lighting, and the duration of the scene. *Id.,* at 97–98, 23.

board's decision, it did not review the merits of the decision at that time. The question at the hearing was whether petitioner should receive *preliminary* relief, *i. e.*, whether there was likelihood of success on the merits and whether petitioner would suffer irreparable injury pending full review. Effective review on the merits was not obtained until more than five months later. Throughout, it was petitioner, not the board, that bore the burden of obtaining judicial review. It was petitioner that had the burden of persuasion at the preliminary hearing if not at the later stages of the litigation. Respondents did not file a formal answer to the complaint for five months after petitioner sought review. During the time prior to judicial determination, the restraint altered the status quo. Petitioner was forced to forgo the initial dates planned for the engagement and to seek to schedule the performance at a later date. The delay and uncertainty inevitably discouraged use of the forum.

The procedural shortcomings that form the basis for our decision are unrelated to the standard that the board applied. Whatever the reasons may have been for the board's exclusion of the musical, it could not escape the obligation to afford appropriate procedural safeguards. We need not decide whether the standard of obscenity applied by respondents or the courts below was sufficiently precise or substantively correct, or whether the production is in fact obscene. See *Hamling* v. *United States,* 418 U. S. 87 (1974); *Jenkins* v. *Georgia,* 418 U. S. 153 (1974); *Lewis* v. *City of New Orleans,* 415 U. S. 130 (1974); *Miller* v. *California,* 413 U. S. 15 (1973); *Gooding* v. *Wilson,* 405 U. S. 518 (1972). The standard, whatever it may be, must be implemented under a system that assures prompt judicial review with a minimal restriction of First Amendment rights necessary under the circumstances.

*Reversed.*

Mr. Justice Douglas, dissenting in part and concurring in the result in part.

While I agree with the Court's conclusion that the actions of the respondents constituted an impermissible prior restraint upon the performance of petitioner's rock musical, I am compelled to write separately in order to emphasize my view that the injuries inflicted upon petitioner's First Amendment rights cannot be treated adequately or averted in the future by the simple application of a few procedural band-aids. The critical flaw in this case lies, not in the absence of procedural safeguards, but rather in the very nature of the content screening in which respondents have engaged.

The Court today treads much the same path which it walked in *Freedman* v. *Maryland,* 380 U. S. 51 (1965), and the sentiment which I expressed on that occasion remains equally relevant: "I do not believe any form of censorship—no matter how speedy or prolonged it may be—is permissible." *Id.,* at 61–62 (concurring opinion). See also *Star* v. *Preller,* 419 U. S. 956 (1974) (dissenting opinion); *Times Film Corp.* v. *Chicago,* 365 U. S. 43, 78 (1961) (dissenting opinion).

A municipal theater is no less a forum for the expression of ideas than is a public park, or a sidewalk; the forms of expression adopted in such a forum may be more expensive and more structured than those typically seen in our parks and streets, but they are surely no less entitled to the shelter of the First Amendment. As soon as municipal officials are permitted to pick and choose, as they are in all existing socialist regimes, between those productions which are "clean and healthful and culturally uplifting" in content and those which are not, the path is cleared for a regime of censorship under which full voice can be given only to those views which meet with the approval of the powers that be.

There was much testimony in the District Court concerning the pungent social and political commentary which the musical "Hair" levels against various sacred cows of our society: the Vietnam war, the draft, and the puritanical conventions of the Establishment. This commentary is undoubtedly offensive to some, but its contribution to social consciousness and intellectual ferment is a positive one. In this respect, the musical's often ribald humor and trenchant social satire may someday merit comparison to the most highly regarded works of Aristophanes, a fellow debunker of established tastes and received wisdom, yet one whose offerings would doubtless meet with a similarly cold reception at the hands of Establishment censors. No matter how many procedural safeguards may be imposed, any system which permits governmental officials to inhibit or control the flow of disturbing and unwelcome ideas to the public threatens serious diminution of the breadth and richness of our cultural offerings.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, dissenting.

Although in Part II of its opinion the Court lectures on the evils of standardless licensing systems, understandably this is not the ultimate basis for decision. However broad discretion the Chattanooga authorities may otherwise have, plainly they are subject to the laws against obscenity and public nudity, and the standard lease requires that productions such as "Hair" not violate the law. In this respect, the licensing system is not without standards. As might be expected, therefore, the issue in the case, as defined by the District Court and the Court of Appeals, was not whether local authorities had undue discretion but whether they correctly refused to license "Hair" on the ground that the production would fail to satisfy "Paragraph (1) of the standard lease form

requiring the lessee to comply with all state and local laws in its use of the leased premises," these laws being the laws against obscenity, public nudity, and display of sexually oriented materials to minors. In so framing the question, the courts below reflected the prayer of the complaint, App. 13–14, which sought a declaration that the musical was protected expression under the First Amendment, did not violate any city ordinance, and was not obscene. An injunction requiring local authorities to make the municipal facilities available for the production of "Hair" was also sought.

The District Court and the Court of Appeals considered the issue tendered and held that the contemplated production of "Hair" did not qualify for a lease under the relevant state and local laws. Here, the majority does not address this question, but nevertheless reverses on the ground that the Chattanooga permit system is "lacking in constitutionally required minimal procedural safeguards." *Ante,* at 552. The Court's understanding of our prior cases is unexceptionable, but reaching a decision on this ground is inappropriate. In the first place, no such issue appears to have been tendered to the District Court or to have been decided by either the District Court or the Court of Appeals. As already indicated, the complaint sought a declaration that "Hair" did not violate the relevant ordinances and statutes as well as an injunction permitting the use of municipal facilities for the showing of the musical. Secondly, however inadequate the Chattanooga system might be under *Freedman* v. *Maryland,* 380 U. S. 51 (1965), the parties have now been to court; and, after trial, "Hair" has been held violative of Tennessee statutes by both the District Court and the Court of Appeals. This Court does not now reverse or disapprove these decisions in this respect; and assuming their correctness, as is therefore appropriate, is it the Court's intention in reversing the judgment

of the Court of Appeals to order that "Hair," which has been held obscene after trial, must be issued a license for showing in the municipal facilities of Chattanooga? If this is the case, it is a very odd disposition, one which I cannot join. On the record before us, it would be error to enter any judgment the effect of which is to require the Chattanooga authorities to permit the showing of "Hair" in the municipal auditorium.

The Court asserts that "Hair" contains a nude scene and that this is "the most controversial portion" of the musical. This almost completely ignores the District Court's description of the play as involving not only nudity but repeated "simulated acts of anal intercourse, frontal intercourse, heterosexual intercourse, homosexual intercourse, and group intercourse . . . ." [1]

---

[1] 341 F. Supp. 465, 472–474 (ED Tenn. 1972):

*"Findings of Fact*

"Turning first to the issue of obscenity, the script, libretto, stage instructions, musical renditions, and the testimony of the witnesses reflect the following relevant matters (It should be noted that the script, libretto, and stage instructions do not include but a small portion of the conduct hereinafter described as occurring in the play):

"The souvenir program as formerly distributed in the lobby (Exhibit No. 1) identified the performers by picture and biographical information, one female performer identifying herself as follows:

" 'Hobbies are picking my nose, fucking, smoking dope, astro projection. All that I am or ever hope to be, I owe to my mother.'

"It was testified that distribution of this program had now been discontinued. Prior to the opening of the play, and to the accompaniment of music appropriate to the occasion, a 'tribe' of New York 'street people' start gathering for the commencement of the performance. In view of the audience the performers station themselves in various places, some mingling with the audience, with a female performer taking a seated position on center stage with her legs spread wide to expose to the audience her genital area, which is covered with the design of a cherry. Thus the stage is set for all that follows. The performance then begins to the words and music of the song 'Aquarius,' the melody of which, if not the words, have

Given this description of "Hair," the First Amendment in my view does not compel municipal authorities to permit production of the play in municipal facilities. Whether or not a production as described by the District Court is obscene and may be forbidden to adult audiences,

become nationally, if not internationally, popular, according to the evidence. The theme of the song is the coming of a new age, the age of love, the age of 'Aquarius.' Following this one of the street people, Burger, introduces himself by various prefixes to his name, including 'Up Your Burger,' accompanied by an anal finger gesture and 'Pittsburger,' accompanied by an underarm gesture. He then removes his pants and dressed only in jockey shorts identifies his genitals by the line, 'What is this God-damned thing? 3,000 pounds of Navajo jewelry? Ha! Ha! Ha!' Throwing his pants into the audience he then proceeds to mingle with the audience and, selecting a female viewer, exclaims, 'I'll bet you're scared shitless.'

"Burger then sings a song, 'Looking For My Donna,' and the tribe chants a list of drugs beginning with 'hashish' and ending with 'Methadrine, Sex, You, WOW!' (Exhibit No. 4, p. 1–5) Another male character then sings the lyric.

" 'SODOMY, FELLATIO, CUNNILINGUS, PEDERASTY—FA-THER, WHY DO THESE WORDS SOUND SO NASTY? MASTURBATION CAN BE FUN. JOIN THE HOLY ORGY, KAMA SUTRA, EVERYONE.' (Exhibit No. 4, p. 1–5)

"The play then continues with action, songs, chants, and dialogue making reference by isolated words, broken sentences, rhyme, and rapid changes to such diverse subjects as love, peace, freedom, war, racism, air pollution, parents, the draft, hair, the flag, drugs, and sex. The story line gradually centers upon the character Claude and his response and the response of the tribe to his having received a draft notice. When others suggest he burn his draft card, he can only bring himself to urinate upon it. The first act ends when all performers, male and female, appear nude upon the stage, the nude scene being had without dialogue and without reference to dialogue. It is also without mention in the script. Actors simulating police then appear in the audience and announce that they are under arrest for watching this 'lewd, obscene show.'

"The second act continues with song and dialogue to develop the story of Claude's draft status, with reference interspersed to such diverse topics as interracial love, a drug 'trip,' impersonation of

it is apparent to me that the State of Tennessee could constitutionally forbid exhibition of the musical to chil-

various figures from American history,[*] religion, war, and sex. The play ends with Claude's death as a result of the draft and the street people singing the song, 'Let the Sunshine In,' a song the testimony reflects has likewise become popular over the Nation.

"Interspersed throughout the play, as reflected in the script, is such 'street language' as 'ass' (Exhibit No. 4, pp. 1–20, 21 and 2–16), 'fart' (Exhibit No. 4, p. 1–26), and repeated use of the words 'fuck'[**] and the four letter word for excretion (Exhibit No. 4, pp. 1–7, 9 and 41). In addition, similar language and posters containing such language were used on stage but not reflected in the script.

"Also, throughout the play, and not reflected in the script, are repeated acts of simulated sexual intercourse. These were testified to by every witness who had seen the play. They are often unrelated to any dialogue and accordingly could not be placed with accuracy in the script. The overwhelming evidence reflects that simulated acts of anal intercourse, frontal intercourse, heterosexual intercourse, homosexual intercourse, and group intercourse are committed throughout the play, often without reference to any dialogue, song, or story line in the play. Such acts are committed both standing up and lying down, accompanied by all the bodily movements included in such acts, all the while the actors and actresses are in close bodily contact. At one point the character Burger performs

"[*]Lincoln is regaled with the following lyrics: 'I's free now thanks to you, Massa Lincoln, emancipator of the slave, yeah, yeah, yeah! Emanci—mother fucking—pater of the slave, yeah, yeah, yeah! Emanci—mother fucking—pater of the slave, yeah, yeah, yeah!' With Lincoln responding, 'Bang my ass . . . I ain't dying for no white man!' "

"[**]A woman taking her departure says to the tribe, 'Fuck off, kids.' (Exhibit No. 4, p. 1–35). The following dialogue occurs as Claude nears his death scene:

" 'Burger: I hate the fucking world, don't you?

" 'Claude: I hate the fucking world, I hate the fucking winter, I hate these fucking streets.

" 'Burger: I wish the fuck it would snow at least.

" 'Claude: Yeah, I wish the fuck it would snow at least.

" 'Burger: Yeah, I wish the fuck it would.

" 'Claude: Oh, fuck!

" 'Burger: Oh, fucky, fuck, fuck!' (Exhibit No. 4, p. 2–22)"

dren,[2] *Ginsberg* v. *New York,* 390 U. S. 629 (1968), and that Chattanooga may reserve its auditorium for productions suitable for exhibition to all the citizens of the city, adults and children alike. "Hair" does not qualify in this respect, and without holding otherwise, it is improvident for the Court to mandate the showing of "Hair" in the Chattanooga auditorium.[3]

---

a full and complete simulation of masturbation while using a red microphone placed in his crotch to simulate his genitals. The evidence again reflects that this is unrelated to any dialogue then occurring in the play. The evidence further reflects that repeated acts of taking hold of other actors' genitals occur, again without reference to the dialogue. While three female actresses sing a song regarding interracial love, three male actors lie on the floor immediately below them repeatedly thrusting their genitals at the singers. At another point in the script (Exhibit No. 4, p. 2–22) the actor Claude pretends to have lost his penis. The action accompanying this line is to search for it in the mouths of other actors and actresses."

[2] The producer, director, and president of petitioner, Southeastern Promotions, Ltd., did not insist in the District Court that petitioner was entitled to exhibit the play to minors contrary to local law. His testimony, Tr. 7–8, was that if there was "a standing ordinance related to the exclusion of minors, we would certainly abide by it . . . ."

[3] As appears from Tr. of Oral Arg. 16–17, petitioner's counsel was of the view that the issue of obscenity must be reached:

"So it would appear that the question of obscenity is not avoided even if the Court agrees with petitioner that the standards used were ultimately bad. Since on remand the respondents are going to press obscenity as the basis for denying access to HAIR and the lower courts are going to sustain that position, we therefore urge this Court to address itself to the question of the appropriate standards, not only to prevent a waste of resources and judicial economy, but because of widespread public interest in resolving this issue. There are very few plays that can afford the expense of litigation all the way to this Court."

MR. JUSTICE REHNQUIST, dissenting.

The Court treats this case as if it were on all fours with *Freedman* v. *Maryland,* 380 U. S. 51 (1965), which it is not. *Freedman* dealt with the efforts of the State of Maryland to prohibit the petitioner in that case from showing a film "at his Baltimore theater," *id.,* at 52. Petitioner here did not seek to show the musical production "Hair" at *its* Chattanooga theater, but rather at a Chattanooga theater owned by the city of Chattanooga.

The Court glosses over this distinction by treating a community-owned theater as if it were the same as a city park or city street, which it is not. The Court's decisions have recognized that city streets and parks are traditionally open to the public, and that permits or licenses to use them are not ordinarily required. "[O]ne who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word." *Jamison* v. *Texas,* 318 U. S. 413, 416 (1943). The Court has therefore held that where municipal authorities seek to exact a license or permit for those who wish to use parks or streets for the purpose of exercising their right of free speech, the standards governing the licensing authority must be objective, definite, and nondiscriminatory. *Shuttlesworth* v. *City of Birmingham,* 394 U. S. 147 (1969). But until this case the Court has not equated a public auditorium, which must of necessity schedule performances by a process of inclusion and exclusion, with public streets and parks.

In *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968), the Court recognized that the government as an

employer was to be viewed differently from the government as a lawmaker for the citizenry in general:

"[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."

See, *e. g., Communications Association* v. *Douds,* 339 U. S. 382, 402–403 (1950); *United Public Workers* v. *Mitchell,* 330 U. S. 75, 95 (1947); *Konigsberg* v. *State Bar,* 366 U. S. 36, 50–51 (1961). Here we deal with municipal action by the city of Chattanooga, not prohibiting or penalizing the expression of views in dramatic form by citizens at large, but rather managing its municipal auditorium. In *Adderley* v. *Florida,* 385 U. S. 39, 47–48 (1966), the Court said:

"The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property . . . . The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose."

The Court avoids the impact of cases such as *Adderley* by insisting that the municipal auditorium and the theater were "public forums designed for and dedicated to expressive activities," *ante,* at 555, and that the rejection of petitioner's application was not based on "any regulation of time, place, or manner related to the nature of the facility or applications from other users." *Ibid.* But the apparent effect of the Court's decision is to tell the managers of municipal auditoriums that they may

exercise no selective role whatsoever in deciding what performances may be booked. The auditoriums in question here have historically been devoted to "clean, healthful entertainment"; [1] they have accepted only productions not inappropriate for viewing by children so that the facilities might serve as a place for entertaining the whole family. Viewed apart from any constitutional limitations, such a policy would undoubtedly rule out much worthwhile adult entertainment. But if it is the desire of the citizens of Chattanooga, who presumably have paid for and own the facilities, that the attractions to be shown there should not be of the kind which would offend any substantial number of potential theatergoers, I do not think the policy can be described as arbitrary or unreasonable. [2] Whether or not the production of the version of "Hair" here under consideration is obscene, the findings of fact made by the District Court and affirmed on appeal do indicate that it is not entertainment designed for the whole family. [3]

If every municipal theater or auditorium which is "designed for and dedicated to expressive activities" becomes subject to the rule enunciated by the Court in this case, consequences unforeseen and perhaps undesired by the Court may well ensue. May an opera house limit its

---

[1] See the Court's opinion, *ante,* at 549 n. 4.

[2] Limitations on the use of municipal auditoriums by government must be sufficiently reasonable to satisfy the Due Process Clause and cannot unfairly discriminate in violation of the Equal Protection Clause. A municipal auditorium which opened itself to Republicans while closing itself to Democrats would run afoul of the Fourteenth Amendment. There is no allegation in the instant case that the auditoriums accepted equally graphic productions while unfairly discriminating against "Hair" because of its expressions of political and social belief.

[3] The findings of fact of the District Court were reported at 341 F. Supp. 465, 472–474 (ED Tenn. 1972), and were repeated by the Court of Appeals at 486 F. 2d 894, 895–897 (CA6 1973).

productions to operas, or must it also show rock musicals? May a municipal theater devote an entire season to Shakespeare, or is it required to book any potential producer on a first come, first served basis? These questions are real ones in light of the Court's opinion, which by its terms seems to give no constitutionally permissible role in the way of selection to the municipal authorities.

But these substantive aspects of the Court's opinion are no more troubling than the farrago of procedural requirements with which it has saddled municipal authorities. Relying on *Freedman,* the Court holds that those charged with the management of the auditorium have the burden of instituting judicial proceedings, that "restraint" prior to judicial review can be imposed only for a specified brief period, and that a prompt final judicial determination must be assured. *Ante,* at 560.

If these standards are applicable only where a lease for a production is refused on the grounds that the production is putatively obscene, the Court has performed the rather novel feat of elevating obscene productions to a preferred position under the First Amendment. If these procedures must be invoked every time the management of a municipal theater declines to lease the facilities, whether or not because of the putative obscenity of the performance, other questions are raised. What will be the issues to be tried in these proceedings? Is the Court actually saying that unless the city of Chattanooga could criminally punish a person for staging a performance in a theater which he owned, it may not deny a lease to that same person in order for him to stage that performance in a theater owned by the city?

A municipal theater may not be run by municipal authorities as if it were a private theater, free to judge on a content basis alone which plays it wishes to have performed and which it does not. But, just as surely, that element of it which is "theater" ought to be accorded

some constitutional recognition along with that element of it which is "municipal." I do not believe fidelity to the First Amendment requires the exaggerated and rigid procedural safeguards which the Court insists upon in this case. I think that the findings of the District Court and the Court of Appeals support the conclusion that petitioner was denied a lease for constitutionally adequate and nondiscriminatory reasons. I would therefore affirm the judgment of the Court of Appeals.