Lonny F. Zwiener, Asst. Atty. Gen., Austin, Tex., Pat Bailey, Houston, Tex., for defendants-appellants.

Marjorie S. Reed, Daniel M. Armstrong, Deputy Gen. Counsel, Linda L. Oliver, F. C. C., Washington, D. C., for amicus curiae F. C. C.

Theodore D. Frank, Washington, D. C., for amicus curiae Public Broadcasting Service.

David H. Berg & Associates, Philip Zelikow, David H. Berg, Houston, Tex., for plaintiffs-appellees.

**Gertrude BARNSTONE and Harvey Malyn, Plaintiffs-Appellees,**

v.

**The UNIVERSITY OF HOUSTON, KUHT–TV, et al., Defendants-Appellants.**

**No. 81–2011.**

United States Court of Appeals, Fifth Circuit.*

Unit A

Oct. 30, 1981.

Rehearing En Banc Granted Nov. 16, 1981. See 662 F.2d 1110.

Before THORNBERRY, REAVLEY and POLITZ, Circuit Judges.

PER CURIAM:

On May 1, 1980, KUHT–TV, a station owned and operated by the University of

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Houston, announced that it would not air the controversial program, "Death of a Princess," which it had previously scheduled to show on May 12, 1980. Gertrude Barnstone, a resident of Houston, a subscriber to KUHT–TV, and a regular viewer of its offerings, brought this action seeking to compel the station to air the program. On the morning of May 12, the district court entered a written "temporary restraining order" requiring KUHT–TV to show "Death of a Princess" that evening. 487 F.Supp. 1347 (S.D.Tex.1980). That afternoon, we vacated the order on the condition that the defendants "tape and preserve the program in issue." No. 80–1527 (5th Cir. May 12, 1980). That evening, the Supreme Court refused to vacate our order. 446 U.S. 1318, 100 S.Ct. 2144, 64 L.Ed.2d 488 (1980) (Powell, Circuit Justice).

After a full trial on the merits, the district court entered an order requiring the station to telecast "Death of a Princess" within thirty days. 514 F.Supp. 670 (S.D. Tex.1980). We stayed that order pending this appeal. No. 81–2011 (Jan. 14, 1981). We now reverse and instruct the district court to dissolve the injunctive relief it granted.

The district court held that KUHT–TV is a "public forum" as that term is used in First Amendment jurisprudence, see *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975), and that therefore it could not deny access to speakers—here, the producers of "Death of a Princess"—who wished to be heard in the public forum, unless its reasons for doing so could withstand the

rigorous scrutiny to which "prior restraints" are traditionally subjected. 514 F.Supp. at 689–91. Appellees defend this holding, and they also defend the district court's order on the ground that KUHT–TV's decision was based on the political content of the program. Both of these arguments were recently considered and rejected by this court in *Muir v. Alabama Educational Television Commission,* 656 F.2d 1012, 1020, 1023 (5th Cir. 1981). We are bound by the decision in *Muir.*

Thus, the judgment of the district court is REVERSED. The district court shall dissolve the injunctive relief and render judgment for appellants.

REVERSED and REMANDED.

REAVLEY, Circuit Judge, concurring:

I join in the panel's opinion because I agree that we are bound by *Muir v. Alabama Educational Television Commission,* 656 F.2d 1012 (5th Cir. 1981). I write separately, however, to express my disagreement with the reasoning of the *Muir* panel.

The *Muir* panel has concluded that a government-owned television station is protected by the First Amendment.[1] As far as I know, this holding has no precedent in American constitutional jurisprudence. "The First Amendment protects the press *from* governmental interference; it confers no analogous protection *on* the Government." *CBS, Inc. v. Democratic National Committee,* 412 U.S. 94, 139, 93 S.Ct. 2080, 2104–05, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) (emphasis in original).[2] While I

---

1. See *Muir,* 656 F.2d at 1020 ("AETC's refusal to broadcast 'Death of a Princess' is itself constitutionally protected"); *id.* at 1023 (court inquiry into whether program was cancelled on the basis of its political content "is not only undesirable, it is constitutionally prohibited"); *id.* at 1026.

2. There is nothing to the contrary in the Supreme Court's opinion in *CBS.* The question in *CBS* was whether the First Amendment confers on private citizens an affirmative right of access to the facilities of private broadcasters. See 412 U.S. at 97–98, 93 S.Ct. at 2084. While the Court "assum[ed] governmental action" for purposes of its First Amendment analysis, *id.*

at 121, 93 S.Ct. at 2096, its preservation of First Amendment protection for private broadcasters in performing this analysis is not precedent for conferring First Amendment protection on the government. Had the Court "assumed" that the private broadcasters were government for all intents and purposes, then the Court would not have asserted that it was denying the claimed First Amendment right of access because the result would be "an enlargement of Government control over the content of broadcast discussion of public issues." *Id.* at 126, 93 S.Ct. at 2098. Had the government already been fully in control, then there could be no

have no doubt that the government has the power to exercise "editorial discretion" over its own speech, this power is neither conferred nor protected by the First Amendment; if the First Amendment has any relevance to this power at all, it serves only to limit the power.

By holding that a government broadcaster's editorial discretion is entitled to the near-absolute constitutional protection recognized in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (striking down statute giving politicians "right of reply" access to *newspapers*), *see Muir*, 656 F.2d at 1023, the *Muir* panel has afforded government broadcasters more protection from private citizens than private broadcasters have from

the government. *See CBS, Inc. v. FCC*, 101 S.Ct. 2813, 2829–30 (1981) (upholding politicians' statutory right of access to private television networks); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 386–92, 89 S.Ct. 1794, 1804–08, 23 L.Ed.2d 371 (1969).[3] This is an " 'unusual order of First Amendment values' "[4] indeed.

I have no quarrel with the *Muir* panel's conclusions that a government-owned television station is not a "public forum" and that the public has no "right of access" to such a station.[5] But I do not think that the primary issue in this case or in *Muir* is whether the station is a "public forum," because I do not think the plaintiffs' primary claim is that they have a right to put anything they demand on the air.[6] Rather,

"enlargement" of its control. As two of the five Justices who "assumed governmental action" made clear, "[w]hen governmental action is alleged there must be cautious analysis of the quality and degree of Government relationship to the particular acts in question." *Id.* at 115, 93 S.Ct. at 2093 (Burger, C.J., joined by Rehnquist, J.). In *CBS*, the "governmental action" was merely FCC licensure of privately-owned stations; in this case, the government owns the station and thus has the ability to completely control its programming.

3. "[A]lthough the First Amendment protects *newspaper publishers* from being required to print the replies of those whom they criticize, *Miami Herald* . . ., it affords no such protection to broadcasters . . . ." *FCC v. Pacifica Foundation*, 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) (emphasis added).

4. *Muir*, 656 F.2d at 1016 (quoting *CBS, Inc. v. Democratic Nat'l Comm.*, 412 U.S. at 101, 93 S.Ct. at 2086).

5. I have a bit more trouble with the *Muir* panel's assertion that "[t]here is no evidence here that the government of Alabama had anything whatever to do with AETC's decision [to cancel 'Death of a Princess']. In sum, the present record reflects no basis for a fear that the government of Alabama is 'really operating the electronic press' . . . ." 656 F.2d at 1018 (quoting *CBS*, 412 U.S. at 143, 93 S.Ct. at 2106 (Stewart, J., concurring)) (footnote omitted). The *Muir* panel backs up this assertion by claiming that "[t]he record does not establish . . . that AETC is an 'agency' of [the state]." 656 F.2d at 1018 n.11. Since the *Muir* panel cites an Alabama statute providing that "[t]here is hereby created an agency to be known as the Alabama educational television commission . . .," 656 F.2d at 1014 n.1, this

latter claim and its relevance to the rule established in *Muir* is perplexing, to say the least.

6. Thus, I think it may have been unnecessary to reach the "public forum" issue in these cases. Since the issue is now settled by *Muir*, however, I think it appropriate to set out what I believe is the proper basis for the *Muir* court's holding on the "public forum" issue.

The Supreme Court has recently rejected the theory, adopted by the court below, *see* 514 F.Supp. at 685, that because a government facility is "specifically used for the communication of ideas or information," it is *ipso facto* a public forum. *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, —— U.S. ——, 101 S.Ct. 2676, 2685 n.6, 69 L.Ed.2d 517 (1981) (mail boxes). The district court should have paid closer attention to the test established by this court for determining whether a public facility is a "public forum":

"does the character of the place, *the pattern of usual activity*, the nature of its essential purpose and the population who take advantage of *the general invitation extended* make it an appropriate place for communication of views on issues of political and social significance."

*Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016, 1019 (5th Cir. 1972) (quoting *Wolin v. Port of New York Auth.*, 392 F.2d 83, 89 (2d Cir.), *cert. denied*, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968)) (emphasis added). In the cases in which "public forum" treatment has been afforded, the speakers were attempting to use the public facility in a manner fully consistent with "the pattern of usual activity" and "the general invitation extended." *See, e. g., Hague v. CIO*, 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.) (streets and parks); *Southeast-*

they are complaining that a particular program, already scheduled to be shown and already paid for with the public's money, was cancelled by state officials because they did not like its political content. *See Muir*, 656 F.2d at 1014; *see id.* at 1027–29 (Clark, J., dissenting); *Barnstone*, 487 F.Supp. at 1349; 514 F.Supp. at 674.

Thus, the primary question is whether the cancellation "abridg[es] the freedom of speech." U.S.Const., amend. 1. The First Amendment does not talk primarily in terms of "freedom of speakers," and Supreme Court jurisprudence over the past twenty years makes it clear that identifying the speaker should not be the primary focus of our inquiry.[7] Instead, we should determine whether the government's action here was an "abridgment" that is forbidden by the First Amendment.

I confess the strangeness of the idea that the government may "abridge" freedom of speech when it reverses its decision to send out a message that it could simply have declined to send out in the first place. The idea is, however, established by the precedents of this court. We have held in the past that once the government makes a facility available for a particular speaker, it may not deny the use of the facility to the speaker because it objects to the contents of his message. *See Bazaar v. Fortune*, 476 F.2d 570, 574 (student literary magazine) ("once a [state] recognizes a[n] . . . activity which has elements of free expression, it can act to censor that expression only if it acts consistent with First Amendment constitutional guarantees"), *aff'd as modified en banc*, 489 F.2d 225 (5th Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *Brooks v. Auburn University*, 412 F.2d 1171 (5th Cir. 1969) (requiring, in a suit by disappointed listeners, a state university to pay an honorarium and travel expenses to a speaker whose invitation was withdrawn by the university president because of what the speaker might say). The *Muir* panel neither cites nor distinguishes these precedents.

The station and the *amici* raise the fear that the slightest judicial scrutiny will result in court supervision of their regular programming decisions. I share their concern. But this case is not a challenge to the station's general pattern of programming or its failure to select any particular program for programming: rather, plaintiffs charge that a program already selected, paid for, and scheduled to be aired by the station's professional programmer was cancelled by a state official[8] because of the allegations the program made against the

---

ern *Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (rental of public auditorium normally rented out for such uses) ("Petitioner was not seeking to use a facility primarily serving a competing use."). The pattern of usual activity at KUHT–TV, by contrast, is for professional programmers to do the programming; the general invitation extended to the public is not to schedule programs, but to watch or decline to watch what is offered.

7. In *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Supreme Court struck down a law restricting corporate contributions and expenditures for the purpose of advocating any political position. In so doing, the Court found it completely unnecessary to decide whether corporations are speakers who "have" First Amendment rights. "Instead," the Court said, "the question must be whether [the state's law] abridges expression that the First Amendment was meant to protect." *Id.* at 776, 98 S.Ct. at 1415; *see id.* at 775–86, 98 S.Ct. at 1415–21; *Virginia State Bd. of Pharmacy v. Virginia Citi-*

zens *Consumer Council, Inc.*, 425 U.S. 748, 756, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976) (consumers have standing to challenge restrictions on pharmacists' speech) ("the protection afforded is to the communication, to its source and its recipients both"); *Lamont v. Postmaster General*, 381 U.S. 301, 305–07, 85 S.Ct. 1493, 1495–96, 14 L.Ed.2d 398 (1965) (First Amendment protects the "unfettered" right to receive political messages sent through the mail).

8. In this case, the decision to telecast "Death of a Princess" had been made by KUHT–TV's full-time director of programming. The decision to cancel was made by the school's Vice President for Public Information and University Relations, who had full responsibility for the operation of the station, but who had never before, in 17 years, made a programming decision. His decision was opposed by the programming director and, eventually, by the general manager of KUHT–TV. *See* 514 F.Supp. at 673–74.

government of Saudi Arabia. *See* 514 F.Supp. at 674. To my mind, this case is quite similar to the case in which a librarian places a book on the library shelf, only to have it removed by supervisory authorities because they object to the political views it contains. The clear majority of the courts that have considered this issue have agreed that the state may remove the book for any number of reasons, but a desire to silence its political message is not one of them. *See Pico v. Board of Education*, 638 F.2d 404 (2d Cir. 1980), *cert. granted,* —— U.S. ——, 102 S.Ct. 385, 70 L.Ed.2d 205 (1981) (while removal of books from school library shelves in itself, or even removal because such books are "tasteless" or "offensive," is not a First Amendment violation, removal because of the political ideas the books express is unconstitutional); *Zykan v. Warsaw Community School Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980) (dictum) (if complaint alleges removal of books in an effort to exclude a particular type of thought, it states a claim); *Minarcini v. Strongsville City School District*, 541 F.2d 577, 582 (6th Cir. 1976); *Salvail v. Nashua Board of Education*, 469 F.Supp. 1269, 1274

(D.N.H.1979) (removal of "Ms." magazine because of its feminist political viewpoint); *Right to Read Defense Committee v. School Committee*, 454 F.Supp. 703, 712 (D.Mass. 1978); [9] *cf. Sefick v. City of Chicago*, 485 F.Supp. 644, 651 (N.D.Ill.1979) (once city had given artist permit to exhibit his work in a public building, it could not revoke the permit on the ground that the work satirized the mayor).

Freedom of speech concerning public issues "is at the heart of the First Amendment's protection." [10] Therefore, I believe that the primary inquiry in this case should be whether the government has attempted to silence a message because of its political content. If the plaintiffs can establish this, then the government's decision is presumptively unconstitutional. *See* L. Tribe, American Constitutional Law § 12–2, at 581 (1978). If the government can establish that, regardless of its impermissible motive, it would have cancelled the program for legitimate reasons, then it is, in my view, entitled to judgment. *See Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).[11]

**9.** I note that the above-cited cases all involve school libraries; I would assume, as a general matter, that the school board has, if anything, broader discretion in determining the political content of materials selected for school children than the government broadcaster has in selecting offerings for the general public. *See Ambach v. Norwick*, 441 U.S. 68, 76–79, 99 S.Ct. 1589, 1594–96, 60 L.Ed.2d 49 (1979).

My reliance on these cases, however, implies no endorsement of the varying "tests" and reasoning they contain. For reasons I explain below, *see* note 11 *infra*, I would not put the initial burden on the government broadcaster to explain its every "questionable" decision, as some of these cases apparently do. *See, e. g., Pico v. Board of Educ.*, 638 F.2d at 415 (Sifton, J.); *Minarcini v. Strongsville City School Dist.*, 541 F.2d at 582. Moreover, the government broadcaster undoubtedly has much broader discretion to cancel "offensive" material than some of the cited cases concede to the school board. *Compare Right to Read Defense Comm. v. School Comm.*, 454 F.Supp. at 712, *with FCC v. Pacifica Foundation*, 438 U.S. 726, 748–51, 98 S.Ct. 3026, 3039–41, 57 L.Ed.2d 1073 (1978) (First Amendment does not prevent government from restricting the broadcast of "indecent" and "offensive" material). Rather, I rely on these cases because they all ex-

pressly or implicitly support what I thought was a universally-held position: that the government cannot act against speech because of its political content.

**10.** *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. at 776, 98 S.Ct. at 1415; *see Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966) ("there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs"); *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government").

**11.** I think that the *Mt. Healthy* test is the proper one to apply in the government broadcasting context. Just as the *Mt. Healthy* Court was attempting to strike a balance between the state's authority as employer and the employee's First Amendment rights, we must here strike a balance between the state's ability to run its public broadcasting station and the protection of "the freedom of speech." If we were to require the government broadcaster to justify its every programming decision, we would make it impossible for government-run PBS stations to operate. The result would be a

Since *Muir* forecloses this inquiry, I do not say what the result of the inquiry would be in the case before us. I recommend the inquiry because I fear that these cases involve not only the "Death of a Princess," but the wounding of a principle.

diminution in the variety and quality of the programs offered, a result contrary to the goals of the First Amendment. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here."). Thus, I would keep on the plaintiff the heavy burden of establishing that each particular government decision he complains of was motivated by an impermissible purpose—here, the desire to silence a political message.

For the same reasons, I would require the state to justify its decision with legitimate, not "compelling," reasons. I can think of several such reasons in the broadcasting context: because

the program is offensive, *see* note 9 *supra*, because it makes allegations that are defamatory, false, or misleading, because a superior or more popular program becomes available. In this case, the district court found that the responsible university official "may have" decided to cancel the program out of concern for the safety of a professor who was in Saudi Arabia working as a tutor. *See* 514 F.Supp. at 675; *see also Muir*, 656 F.2d at 1019 (claim of threat to well-being of Alabama citizens in the Middle East). If the state could prove that its concern had some basis and that the concern was truly a reason for its decision, then I would not require it to wait to cancel the show until a gun was put to the professor's head.