651 So.2d 97 (1994)
Philip H. TAYLOR, Appellant,
v.
SEARCY DENNEY SCAROLA BARN-HART & SHIPLEY, P.A.; and Gary, Williams, Parenti & Taylor, P.A., Appellees.
No. 93-0319.
District Court of Appeal of Florida, Fourth District.
November 30, 1994.
Opinion on Denial of Rehearing and Certification March 1, 1995.
*98 Bruce S. Rogow, of Bruce S. Rogow, P.A., and Beverly A. Pohl, Fort Lauderdale, for appellant.
Daniel S. Pearson, Lenore C. Smith, Lucinda A. Hofmann of Holland & Knight, Miami, for appellees.
FARMER, Judge.
A lawyer appeals a judgment in a civil proceeding that he is guilty of contempt of court and that imposed a fine of $1,700,000 for violating an injunction against communication with his client. We reverse.
We begin by emphatically reconfirming the principle that every litigant, and especially a lawyer, must comply with an injunction  even those that the person believes in good faith to be entirely erroneous. This is undoubtedly even more true where the injunction has survived an appeal, as happened in this case.[1] The fact that this injunction appears to lack legal support and may interfere with protected First Amendment interests does not in any way establish that it is void. A pretrial injunction would be void only if the court entering it lacked subject matter jurisdiction or had not yet acquired jurisdiction over the defendant. Neither circumstance is applicable here.
In our opinion, it is the finding of contempt and the fine that must be set aside. The contempt proceeding was held after Judge Kanarek had granted Taylor's motion to substitute his new firm for the Searcy Denney firm.[2] When the issue of contempt was heard, the injunction was no longer effective and thus the purpose of the motion could only have been punitive  enforcement no longer being an issue and coercion having *99 thus been made moot. That means to us that the matter should have been handled as one seeking to punish for indirect criminal contempt of court. Rule 3.840 governs such proceedings,[3] but none of its requirements were followed here. A reversal on that procedural ground is unavoidable.
But even if the correct procedure for indirect criminal contempt of court had been followed, we would still vote to find the fine excessive. The fine imposed is $1,700,000. As we read the statutes, the amount of fines in criminal cases is controlled by section 775.083, Florida Statutes (1993), which authorizes fines ranging from $15,000 for life felonies down to $500 for second degree misdemeanors and noncriminal violations, unless another statute specifically allows an even higher amount. Subsection (f) of section 775.083 authorizes "any higher amount equal to double the pecuniary gain derived from the offense by the offender or double the pecuniary loss suffered by the victim."
Neither of these alternative justifications is available here because there has been no finding as to any gain derived by Taylor or loss suffered by Searcy Denney. In fact, whether there could ever be such a gain or loss is highly doubtful as a matter of law. In Rosenberg v. Levin, 409 So.2d 1016 (Fla. 1982), the court declared the following policy in this state:
"We approve the philosophy that there is an overriding need to allow clients freedom to substitute attorneys without economic penalty as a means of accomplishing the broad objective of fostering public confidence in the legal profession. Failure to limit quantum meruit recovery defeats the policy against penalizing the client for exercising his right to discharge. However, attorneys should not be penalized either and should have the opportunity to recover for services performed."
409 So.2d at 1021. Later the court made it clear that an attorney is not free to exact a penalty for the client exercising a right to discharge the attorney. The Florida Bar v. Doe, 550 So.2d 1111 (Fla. 1989). Still later the court condemned a fee agreement provision that made the discharging client responsible for the fee provided in the original fee agreement unless the discharged lawyer, the client and the successor lawyer all agree on a substitute fee. The Florida Bar v. Hollander, 607 So.2d 412 (Fla. 1992). Plainly, under these cases, the discharged lawyer cannot contend that he has suffered damages in lost fees equal to the amount of the original fee agreement.
The cases also leave us with doubts that the contempt court could punish the successor lawyer by a fine equal to the contract fee. If this result could obtain, it would not be fanciful to foresee a discharging client facing substantial difficulty in obtaining the services of a successor lawyer. Such difficulties could be understood as the client suffering a penalty simply for exercising the right to discharge the lawyer at any time. For the moment, however, it is sufficient for us to note the absence of anything in the present record that would authorize a fine in excess of the statutory limits on the theory of damages caused or gains derived. In sum, there is absolutely no legal foundation for the amount of the fine imposed in this case, and thus it is by any definition excessive.
We remand for further proceedings consistent with this opinion.
HERSEY, J., concurs.
MAGER, GERALD, Senior Judge, concurs in part, dissents in part with opinion.
MAGER, GERALD, Senior Judge, concurring in part and dissenting in part.
I concur with the majority only insofar as the judgment below should be reversed. Respectfully, however, I find no basis to send this case back to the trial court to revisit the matter of contempt or imposition of a fine for the reasons hereafter set forth with particularity.
In this appeal from a finding of contempt for violating an injunction, the issues presented are particularly troublesome because they bring into play two concepts that are, seemingly, on a direct collision course with each other, namely: (1) the power of the *100 court to enter an injunction and the sanctity of that order, i.e., the requirement that the order be obeyed, arguably more so, when the enjoined party is an attorney; and (2) the right of an individual to be able to retain and terminate an attorney. Inherent in that process is the ability of the client to communicate with the attorney and the ability of the attorney to communicate with the client. Inherent in the injunction order and the obedience process is the notion that the order must be obeyed regardless of the belief that the order is unreasonable, unjust or inequitable, until the order is vacated, modified, set aside or determined to be void.
The injunction giving rise to the contempt on appeal enjoined an attorney from communicating with persons alleged to be clients of the firm he left.
An appellate court occupies the enviable position of engaging in "20/20 hindsight"  the court is given the authority and has the responsibility to look back at what happened at the trial level and determine whether that which occurred is, or is not, sustainable in accordance with applicable legal principles. The subject matter of the attorney-client relationship and, more emphatically, the right of an individual to be free to select or terminate an attorney and implicitly, the ability to communicate with that attorney, is so fundamentally embedded in our jurisprudence that there must be a heightened sensitivity before proscribing conduct that has the effect of restricting the free flow of that process.
The exercise of a court's power to enjoin an act or activity is bounded by many traditional cautionary red flags so as to insure that its exercise is sparingly undertaken. See, e.g., Storer Communic. v. State Dept. of Legal Affairs, 591 So.2d 238 (Fla. 4th DCA 1991) (ordinarily, temporary injunctions should not be issued where the legal rights of the parties are in substantial dispute); Tamiami Trail Tours, Inc. v. Greyhound Lines, Inc., 212 So.2d 365 (Fla. 4th DCA 1968) (to support granting of a temporary injunction, plaintiff must demonstrate irreparable injury which cannot be redressed in a court of law, and mere loss of business because of a competitor will not suffice); Islandia Condominium Ass'n, Inc. v. Vermut, 438 So.2d 89 (Fla. 4th DCA 1983) (the issuance of a preliminary [temporary] injunction is an extraordinary and drastic remedy which should be granted sparingly); Contemporary Interiors v. Four Marks, Inc., 384 So.2d 734 (Fla. 4th DCA 1980) (to support the award of a temporary injunction, a party must prove (1) irreparable harm, (2) a clear legal right, (3) an inadequate remedy at law, and (4) consideration of the public interest); Cordis Corp. v. Prooslin, 482 So.2d 486 (Fla. 3d DCA 1986) (a party seeking a temporary injunction must establish, "a substantial likelihood of success on the merits"); Supreme Service Station Corp. v. Telecredit Service Center, Inc., 424 So.2d 844 (Fla. 3d DCA 1982) (irreparable harm for the purpose of injunction is not established where the harm can be compensated for adequately by money damages).
A trial court must carefully examine the subject matter when its injunctive power is sought to be applied, carefully assess the effect of the injunction, and ascertain whether it impacts upon rights or relationships that are so fundamental as to place them beyond the scope of the court's authority to deal with by way of injunction. See Cordis Corp. v. Prooslin, 482 So.2d 486 (Fla. 3d DCA 1986) (before entering a temporary injunction, the trial court must use a balancingtype approach, balancing the possible beneficial results on the one hand with the possible detrimental results on the other). Communication between an individual (who is a client or prospective client) and an attorney is a subject matter that may be beyond the authority of the court to restrict, vis-a-vis the injunction process. If judicial restrictions upon such communications were permissible, the scope of any injunction would require precision in implementation and not overbreadth in incantation. The applicability of these observations will become self-evident.
The instant appeal contains a plethora of factual events and a host of sub-facts and factual nuances which do not necessarily require a full recitation and discussion. I intend to refer only to those facts or factors that I deem particularly suited and significant to the disposition that I believe to be more appropriate than that reached by the majority.
*101 The appellant, Phillip Taylor (hereafter "Taylor"), was an associate with the law firm of appellees, Searcy, Denney Scarola, Barnhart & Shipley, P.A. (hereafter "SDS"). In November, 1991, Taylor advised SDS of his intention to leave the firm. SDS asked Taylor to prepare a list of those cases which he felt had come directly to him; no list was forthcoming. It appears that SDS also requested Taylor not to contact any of the firm's clients unless he received permission from SDS to do so. However, on November 22, Taylor sent a letter to various SDS clients including one Mary Barner,[4] a client whom SDS represented in a medical malpractice action in the 19th Judicial Circuit, which stated:
Dear Client:
I have recently resigned from Searcy, Denney Scarola, Barnhart and Shipley. I am now affiliated with the law firm of GARY, WILLIAMS, PARENTI & TAYLOR, with offices in Stuart, Port St. Lucie and Fort Pierce, Florida. According to the Professional Ethics of the Florida Bar Opinion 84-1, November 1, 1984, the primary consideration in determining the issue of whether the clients involved are the associate's clients or the law firm's clients should be THE INTEREST AND WELFARE OF THE CLIENT.
SDS began receiving letters from clients terminating the firm's services. Thereafter, a motion for substitution of counsel in the Mary Barner case, postmarked November 22, 1991, was received by SDS, with a hearing scheduled on November 27, 1991, before Judge L.B. Vocelle in the Nineteenth Judicial Circuit, where the Barner case was pending.[5] Among those attending the hearing before Judge Vocelle on November 27, were a partner in the SDS firm and a partner in the new law firm that Taylor joined. Judge Vocelle heard testimony from Barner indicating her desire to go with Taylor and his new firm. However, the court denied Taylor's motion for substitution of counsel pending an investigation by a guardian ad litem as to whether it was in the best interests of the minor child of Barner to remain with SDS or to terminate that representation and retain Taylor. However, the court was disinclined to enter any order that restricted Barner's contact or communication with Taylor, his new firm, or SDS. Judge Vocelle left this matter up to Barner, observing in part, "she is of age and I don't know if that would be proper." Despite the request made by the SDS partner that Taylor and his firm not communicate "with my client," Judge Vocelle refused to do so observing in part "she has a contract with Mr. Taylor and I don't like the word fire, but she has dismissed Mr. Searcy."[6]
On the same day of the hearing before Judge Vocelle and at the same time Taylor was appearing before Judge Vocelle, another partner in the SDS law firm filed a verified petition for temporary injunctive relief without notice in the Fifteenth Judicial Circuit, seeking to preclude Taylor and his new firm from engaging in any communications with SDS clients, except with the knowledge and consent of SDS. Attached to the petition was a list of cases, including the Barner case, making reference specifically to "Mary Lee Barner."[7] An ex parte emergency hearing was held before one of the circuit judges in *102 Palm Beach county; the SDS petition for temporary injunctive relief was granted, with a finding that "irreparable harm is likely to result if respondents [Taylor and his new firm] are not restrained forthwith from communicating with clients of petitioner [SDS] regarding the subject of their representation and pending or potential legal matters." Taylor and his firm were thereafter enjoined from "engaging in any communication with any of the clients of petition identified in the petition attached thereto, unless such communication is with the prior knowledge and consent of the petitioner."[8] On December 13, 1991, after an evidentiary hearing held before Judge Wessel of the Fifteenth Circuit, Taylor's motion to dissolve the temporary injunction was denied. Thereafter, Taylor appealed the non-final order denying his motion to dissolve to the Fourth District. On April 29, 1992, this court issued a per curiam affirmance of that order without opinion, with a dissent by Judge Anstead, discussed in more detail, infra.
Although Taylor continued to communicate with Barner, notwithstanding the temporary injunction entered in November, 1991, it was not until May 15, 1992, that SDS filed a motion to show cause why Taylor should not be held in contempt for its violation. There were a series of events occurring earlier that month which are significant. On May 7, Taylor's then law firm advised SDS that Mary Barner intended to rescind her contingency fee contract with that firm and have SDS proceed with her case. However, it appears that on May 12, Taylor brought Barner to another law firm for representation and Barner cancelled her meeting with SDS scheduled for May 14. The next day SDS filed the motion seeking contempt. On May 18, Taylor was terminated by the firm he had joined after leaving SDS, and following his termination, he and Barner went to another firm with whom Barner ultimately signed a contract. Subsequently, Barner wrote a letter to SDS discharging them. Although SDS asserted that Taylor induced Barner to terminate her relationship with SDS, Barner testified at several different evidentiary hearings, including the hearing on Taylor's motion to dissolve and SDS's motion to hold Taylor in contempt, that it was her decision to select Taylor.
There appears to be little dispute that Taylor continued to communicate with Barner after November 27, 1991, and that Barner communicated with Taylor. It was this conduct which the lower court found to constitute a clear and unequivocal violation of the injunction previously issued.
Evidentiary hearings on SDS's motion to show cause why Taylor should not be held in contempt were held on June 29, September 2, 3, 4 and 28, 1992, and culminated in the court's entry of an order on January 14, 1993, and an amended order entered on February 12, 1993, finding Taylor to be in indirect civil contempt of the court's November 27, 1992, injunction.[9] Interestingly, and somewhat belatedly, on June 22, 1992, Taylor filed a motion seeking to quash and vacate, or in the alternative, to clarify the injunction order of November 27, 1991, asserting among other things: that the trial court had no subject matter jurisdiction as it related to Mary Barner, because of the matter pending before Judge Vocelle; that the trial court's injunction order was void ab initio as being against public policy; that Mary Barner had terminated SDS as of November 22, 1991. No action was taken on this motion until the conclusion of the contempt hearing. The court ultimately concluded that Taylor was "in willful and contemptual violation for failure to obey the court order entered by this court on November 27, 1991, by continuing communications with Mary Barner, including those communications which occurred from May 7, 1992, until the Motion for Contempt was filed on May 15, 1992." The court imposed a compensatory fine in the amount of $1,700,000 payable to SDS "which shall be *103 paid in installments of $5,000 a month, until the sum of $1,700,000 is paid in full."[10]
In the January and February contempt orders (when the court denied Taylor's motion to dissolve, vacate or clarify the November 27, order), the lower court granted an ore tenus motion to dissolve the injunction, specifically finding that "this injunction shall no longer apply to restrict communication of respondent, Phillip H. Taylor, with Mary Barner." Except for the June 22, 1992, order seeking to clarify the November 27, injunction order in several respects and, in particular, with respect to the status of Mary Barner as a client of either SDS or Taylor, my review of the record does not reflect any attempt by Taylor, prior to the entry of the November 27 order and prior to the June 22 order of clarification, to have the lower court specifically address the status of Mary Barner in an effort to have her deleted from the scope of the order restricting communication between Taylor and "clients of SDS."
A variety of appellate issues, including first amendment considerations are presented in this appeal. Taylor has asked the court to run a proverbial legal gauntlet from having us decide, among other things, whether Mary Barner was the client of Phillip Taylor or SDS, to such finite legal considerations as whether the January 24, 1993, contempt order's character was criminal and entered in violation of Fla.R.Crim.P. 3.830. Contrary to the majority view, I find it unnecessary to address the status of the contempt order, vis-a-vis its criminal versus civil status, and other appellate issues raised, in light of the basis on which I believe this appeal should be decided  namely the fundamental first amendment right of an individual to communicate with the attorney of that individual's choice, whether it be for the purposes of retention, continued representation or termination.
Insofar as interference with the lawyer/client right of communication is concerned, I would refer to Judge Anstead's dissent to the per curiam opinion of this court, wherein he candidly expressed his concern:
While there may be substantial questions involved as to the ethical propriety of the lawyer's conduct, as well as questions of the lawyer's potential civil liability for interference with the former firm's relationships with its clients, I do not believe those matters are sufficient to bar all communications between the lawyers and the clients, especially since the clients have a right to choose counsel, regardless of the wisdom of that choice.

Taylor, 596 So.2d at 1287.[11]
I fervently believe that communications between lawyer and client, lawyer and prospective client, and lawyer and client of another law firm represent the type of subject matter that ought not be barred and restrained through the use of injunction. Any such order transcends the power and authority of a court.[12] The notion that a court can enjoin communications between a client and counsel or prospective counsel seems to me to constitute *104 an inappropriate, if not prohibited interference with the right of free expression, not to mention an unwarranted intrusion into a lawyer-client relationship, either existing or sought to be created. The effect of the injunction below was to prevent Mary Barner and all "clients" of SDS from seeking the services of Taylor, if they chose to do so, "regardless of the wisdom of that choice." Taylor, 596 So.2d at 1287 (Anstead dissenting). They may well have been "de facto" parties, because even though they were "free" to seek out Taylor, he could not "communicate" with them under the terms of the injunction, thereby affecting fundamental first amendment rights of free speech applicable to Taylor and SDS "clients." The late Judge Letts, speaking for this court in In re Contempt of Elrod, 455 So.2d 1325 (Fla. 4th DCA 1984), aptly observed:
We begin by agreeing that a court does not have the contempt power to enforce violations of its orders if they are rendered without jurisdiction over the subject matter or the parties... . (citations omitted) Likewise, a person may safely disobey the command of a court even though it has jurisdiction over the subject matter and the parties, if it attempts to enter a particular order that transcends its power and authority. On the other hand, one charged with contempt cannot defend by showing that the order was merely erroneous as distinguished from void. (citations omitted)
(emphasis added)[13]
In reaching this conclusion, I am not unmindful of the per curiam disposition made by an earlier panel in the same case. See Taylor, 596 So.2d at 1287. In my view, the earlier action taken by this court does not constitute a bar to this court's further consideration of the cause and issues raised herein. The per curiam opinion simply upheld the lower court's action denying Taylor's motion to dissolve the temporary injunction. Analogously, this court was no more bound by that preliminary disposition in consideration of a plenary appeal, than the trial court would have been had the matter come on for final hearing on the merits. See Ladner v. Plaza Del Prado, Condominium Ass'n, Inc., 423 So.2d 927 (Fla. 3d DCA), rev. denied, 434 So.2d 887 (Fla. 1983).[14] Had the matter gone to final hearing, the lower court would not have been bound by its action taken in granting a temporary injunction; the lower court was free to either dissolve that injunction or make it permanent, notwithstanding its earlier action. The fact that this court issued a per curiam affirmance in an appeal from the lower court's denial of a motion to dissolve, was not binding either on this court or on the lower court's further action. See Ladner, 423 So.2d at 929.[15]
Furthermore, based upon the legal posture of this case, vis-a-vis review of an order refusing to deny a motion to dissolve a temporary injunction, I do not believe that the doctrine of "law of the case" applies. The doctrine, in its general application, is intended to preclude re-litigation of issues previously ruled upon by an appellate court, although it is not entirely settled whether the doctrine is limited to issues "actually considered" or issues "which could have been considered." U.S. Concrete Pipe Co. v. Bould, 437 So.2d 1061 (Fla. 1983) (the doctrine is limited to ruling on questions of law actually presented and considered on a former appeal). Two M Dev. Corp. v. Mikos, 578 So.2d 829 *105 (Fla. 2d DCA 1991) (the doctrine of the law of the case applies to issues that were actually considered and decided on a former appeal involving the same action (emphasis added)). See Raymond T. (Tom) Elligett Jr. and Charles P. Schropp, Law Of The Case Revisited, Fla. Bar Journal, Mar. 1984, at 48, et seq.
However, "[t]he doctrine of law of the case does not apply to matters that were not litigated to finality on a prior appeal." See McWilliams v. State, 620 So.2d 222, 225, n. 2 (Fla. 1st DCA 1993), citing Wells Fargo Armored, Servs. Corp. v. Sunshine Sec. & Detective Agency, Inc., 575 So.2d 179, 180 (Fla. 1991). Having previously observed that neither the trial court nor the appellate court is bound by action taken in entering a preliminary injunction, insofar as further and final action is concerned, it becomes unnecessary "to split hairs" to determine what legal or factual issues were or could have been presented to the trial court or this court or what issues were decided by implication, because of the lack of "finality" attached to the legal effect of a preliminary injunction. Wells Fargo, 575 So.2d at 180; Ladner, 423 So.2d at 927.
While the purpose of the doctrine is "to lend stability to judicial decisions, to avoid piecemeal appeals, and to bring litigation to an end as expeditiously as possible, Strazzulla v. Hendrick, 177 So.2d 1 (Fla. 1965), where it's application would result in "manifest injustice," a strict and rigid adherence to the rule is not required. See Id., at 4. The supreme court pointed out in Strazzulla, quoting from Beverly Beach Properties v. Nelson, 68 So.2d 604 (Fla. 1953), cert. dismissed, 348 U.S. 816, 75 S.Ct. 27, 99 L.Ed. 643 (1954):
We may change "the law of the case" at any time before we lose jurisdiction of a cause and will never hesitate to do so if we become convinced, as we are in this instance, that our original pronouncement of the law was erroneous and such ruling resulted in manifest injustice. In such a situation a court of justice should never adopt a pertinacious attitude.
Strazzulla, 177 So.2d at 3.[16]See also White Sands Inc. v. Sea Club V. Condo Ass'n, Inc., 591 So.2d 286 (Fla. 2d DCA) (an appellate court has inherent authority to reconsider and reverse a previous ruling that is law of the case), rev. denied, 599 So.2d 1279 (Fla. 1992).
If the doctrine is applicable (which I do not believe it to be), the facts of the case would lend themselves to the application of the exception to the doctrine, as previously discussed. If the lawyer/client communication issue were implicitly before the prior panel (or should have been presented), I do not believe that this court would have to accept the per curiam disposition (without opinion) as "etched in stone," where to do so would impale fundamental first amendment rights and result in manifest injustice.[17]See also McDonough Power Equipment, Inc. v. Brown, 486 So.2d 609, 611 (Fla. 4th DCA 1986) ("[T]he law of the case that is implicitly established in an earlier appeal is subject to change as the appellate court's explicit erroneous ruling is, so long as the appellate court has jurisdiction, if otherwise the result will be manifestly unjust. (citations omitted)")
*106 In summary, it is my view that the order granting temporary injunctive relief without notice entered on November 27, 1991, barring Taylor from communicating with any SDS clients, was beyond the power and authority of the trial court  and to that extent, the order was void and could be "safely disobeyed." As such, Taylor could not be held in contempt for disobeying the injunction.[18]
Accordingly, I would vacate and set aside the contempt order of January 14, 1993, and the amended order of February 12, 1993, and not remand it back for further proceedings.

ON MOTION FOR REHEARING
The principal argument in the motion for rehearing engaging our reflection is in appellee Searcy Denney's contention that certain dicta in our opinion was in error and threatens to mislead the trial judge in future proceedings. In our original opinion we observed:
"The cases also leave us with doubts that the contempt court could punish the successor lawyer by a fine equal to the contract fee. If this result could obtain, it would not be fanciful to foresee a discharging client facing substantial difficulty in obtaining the services of a successful lawyer. Such difficulties could be understood as the client suffering a penalty simply for exercising the right to discharge the lawyer at any time. For the moment, however, it is sufficient for us to note the absence of anything in the present record that would authorize a fine in excess of the statutory limits on the theory of damages caused or gains derived."
Maj. Op. at 99. As the foregoing makes clear, our expressed doubts hinged on the strong public policy articulated in Rosenberg v. Levin, 409 So.2d 1016 (Fla. 1982), allowing clients the right to discharge lawyers before the occurrence of a contingency and thus limiting the discharged lawyers' fees to quantum meruit. We were, and are, troubled that a client would be inhibited in exercising the right to discharge an attorney if criminal contempt fines against the successor lawyer in actions brought against the successor by the discharged lawyer could be based on the contract fee lost.
Searcy Denney newly advances the argument that our observation is legally wrong because its action below is based on the theory of intentional interference with contractual rights, as to which the measure of damages is the amount of the fee lost by reason of the alleged wrongful interference. Searcy Denney leaps from that statement of law about the measure of damages in an intentional interference action to the conclusion that the measure of damages for Taylor's contemptuous violation of the injunction is identical and leads to the same amount of damages.
The lawsuit out of which the injunction arose was premised on the contention that Taylor had already intentionally interfered with Searcy Denney's contractual rights when the lawsuit was filed. In short, the damages arising from that interference  if any there are  had already been suffered. Later on during the lawsuit, Taylor is said to have violated a court injunction not to speak to his client, and it is the damages suffered from that contempt that Searcy Denney says is equal to the damages flowing from the intentional interference.
But any damages accruing from Taylor's violation of the injunction are indisputably separate and distinct from those caused by the alleged interference that led to the lawsuit. Indeed if Searcy Denney's contract of representation had already been interfered with and they had been discharged by the client, as they alleged when they filed their lawsuit, they could not possibly have reincurred the same monetary loss later when Taylor violated the injunction by speaking to *107 the person who had by then become his client. In fact it is very difficult for us to conceive of any damages being proximately caused by Taylor's violation of the injunction. Any monetary damage to Searcy Denney had already been done. Taylor's flouting of the injunction may have been completely wrong, it may have offended the dignity of the court, it may even require punishment, but it is hard to conceive of it causing Searcy Denney any additional monetary loss.
Hence we repeat what we said before. We have grave doubts that the measure of damages suffered from the violation of the court order could be used in this case as a separate justification for the amount of the contempt fine.
REHEARING AND CERTIFICATION DENIED.
HERSEY, J., concurs.
MAGER, GERALD, Senior Judge, concurs and dissents with opinion.
MAGER, GERALD, Senior Judge, concurring in part and dissenting in part.
In my dissent to the original opinion, I indicated that I concurred with the majority, only insofar as reversal of the judgment for contempt and the fine imposed were concerned, being of the view that no further trial proceedings were appropriate. This writer still finds it inconsistent with and chilling to a client's fundamental first amendment right to communicate with counsel, when we validate the entry of an injunction prohibiting communication by counsel. We thereby, sanction indirectly, what no court has the power to do directly, namely, enjoining a "client" or prospective client from communicating with an attorney of that client's choice. This writer's position is fully articulated in the dissent to the original opinion and reaffirmed herein. Had our reversal been predicated upon the reasons and legal authorities previously set forth in the dissent, there would seemingly not have been a necessity to clarify or sort out the measure of lawyer damages flowing from the violation of an injunction as distinguished from an intentional tort. Furthermore, I also dissent from the majority's refusal to certify the case to the Supreme Court of Florida, to address the fundamental concerns set forth in the dissent to the original opinion. If ever a case more clearly involved a question of great public importance justifying the supreme court's exercise of jurisdiction, it is this one!
NOTES
[1] See Taylor v. Searcy, Denney, Scarola, Barnhart & Shipley P.A., 596 So.2d 1287 (Fla. 4th DCA 1992). We have been asked on this appeal to recede from the decision in that earlier appeal on the grounds that it is itself clearly erroneous. We decline to do so even though if we had been assigned to the panel we might have joined Judge Anstead in reversing the injunction. While we may believe that there is no authority for enjoining clients and lawyers from speaking to one another about the subject of the lawyer's representation  and that the existence of a dispute between lawyers contending for the client's continued representation appears to be the weakest of all possible justifications to enjoin communications between the contending lawyers and the client  nevertheless, we strongly feel that the lawyer enjoined is bound to follow the injunction thus affirmed so long as it is in effect.
[2] The order substituting Taylor's new firm was entered on 9 June 1992. Although the motion for contempt was filed on 15 May 1992, the hearing on the motion did not begin until 2 September 1992 and took four hearing days to finish.
[3] See Fla.R.Crim.P. 3.840.
[4] Mary Barner is the mother of Joseph Burkes, who suffered a brain injury at birth. She filed suit against the hospital and several doctors in Indian River County as "Guardian and Natural Parent of Josep Burkes."
[5] Mary Barner sent a letter to SDS on November 22 or November 23, 1991, which was received by SDS on November 27, 1991, terminating her relationship with SDS.
[6] An order of substitution was ultimately entered by Judge Vocelle's successor on April 30, 1992. The contempt order under appeal was entered on January 14, 1993, and amended on February 12, 1993.
[7] In its petition, SDS alleged, among things: that clients of SDS had reported "ongoing efforts by Taylor to induce" them to sever their relationship with SDS; that these efforts continued despite verbal warning by SDS to Taylor; that "the improper communications have caused substantial interference in the relationships between Petitioner and its clients, have caused confusion, unrest, and anxiety of multiple relationships, some but not all of which have been repaired" and "the nature of these injuries are such that there is no adequate remedy at law and irreparable injury loss or damage will result if these communications are permitted to continue."
[8] SDS subsequently filed a four count complaint against Taylor seeking damages based upon fraud, tortious interference, breach of contract and breach of fiduciary duty which remains pending below.
[9] The amended order was virtually identical to the original order except that it now referred to the contempt as "indirect civil contempt" and deleted punishment of incarceration in the Palm Beach County jail for a period of 150 days, subject to a purge payment provision.
[10] In an evidentiary hearing held on the matter of damages suffered by SDS as a result of Taylor's continued communication with Barner, or more specifically, Taylor's representation of Barner through his new firm, various monetary damages in the millions of dollars were claimed by SDS. Taylor and his new law firm settled the Barner case (prior to the adjudication of contempt) in the neighborhood of 4.3 million dollars. The net effect of the compensatory fine payment to SDS equated to an amount approximately 40% of the amount realized by Taylor and his new law firm as a result of the settlement.
[11] Still pending before the trial court is SDS's complaint for damages arising out of Taylor's conduct. There is also an action pending before the circuit court in Indian River County, between SDS and Barner, regarding fees sought by SDS resulting from his discharge by Barner before settlement was secured. Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Barner, 632 So.2d 1071 (Fla. 4th DCA 1994). See also footnote 7, supra. In addition, the grievance committee of the Florida Bar, in reviewing allegations against Taylor regarding behavior leading up to the contempt orders against him, i.e., whether his conduct constituted an ethical violation, found no probable cause, as reflected in the May 25, 1994, letter from the Florida Bar to Taylor, filed without objection with this court as supplemental authority.
[12] There is a heavy presumption against the constitutional validity of any system of prior restraint. See Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).
[13] As long as an injunction is in force and until that order is modified or vacated, it must be obeyed and it is no defense to a charge of contempt that the injunction order is erroneous, unreasonable or unjust. Seaboard Air Line R. Co. v. Tampa Southern R. Co., 101 Fla. 468, 134 So. 529 (1931). However, one can defend against a charge of contempt if it can be shown that the order is void or that the order "transcends its [court] power or authority... ." Elrod, 455 So.2d at 1326. See also In re Providence Journal Co., 820 F.2d 1342 (1st Cir.1986), modified, 820 F.2d 1354 (1st Cir.1987) ("... although a court order  even an arguably incorrect order  demands respect, so does the right of the citizen to be free of clearly improper exercises of judicial authority.")
[14] As the record reflects, the injunction action below never came up for final hearing. See footnote 7, supra.
[15] I believe there is a distinction between a preliminary disposition in an injunction case by the trial and appellate court and a preliminary disposition occurring in other types of cases. Cf. New England Ins. Co. v. Int'l Bank of Miami, 537 So.2d 1025 (Fla. 3d DCA 1988). See also Ladner, 423 So.2d at 927.
[16] This court has never hesitated to address earlier rulings or those deemed to have lost their vitality. See Jones v. Hoffman, 272 So.2d 529 (Fla. 4th DCA 1973). In authoring the majority opinion in Hoffman, this writer and this court were staring at almost 100 years of perpetuation of the unjust principle of contributory negligence. In the face of such manifest injustice, we proceeded to adopt the rule of comparative negligence. Although the Supreme Court of Florida (through J. Adkins) took great umbrage with the fact that this court should not have initially "changed the law," the principle announced by us was approved. Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). Time has proven that our action was appropriate. In the decision here, we do not have supreme court precedents in conflict the position I am espousing, and I perceive it to be our responsibility to decide an issue in a manner which comports with the justice of the cause. Time (and the supreme court) will tell whether this view is equally consistent with justice and fair play.
[17] I can safely surmise that the late and esteemed Judge Gavin Letts, a member of the prior panel, did not intend and would not have participated in a disposition that would have set the stage for the incantation of a doctrine that would disregard fundamental rights or permit a manifest injustice.
[18] Our holding that the order in question is void for the reasons stated may be said to be analogous to a finding that the order is "transparently invalid or has only a pretense of validity," and need not be obeyed. Health Clubs, Inc. v. State ex rel. Eagan, 377 So.2d 28 (Fla. 5th DCA 1979), dismissed, 383 So.2d 1191 (Fla. 1980). See also In re Providence Journal Co., 820 F.2d at 1342 (recognizing an exception to the collateral bar rule for transparently invalid orders does not violate the principle that "no man can be judge in his own case" anymore that does recognizing such an exception for jurisdictional defects).