Raymond GERENA, Ulises Rodriguez, Gil Rene–Rodriguez, Leo Vanelli, Frank Ramos, Producciones Gran Escenario, Inc., Producciones Teatro Caribeño, Inc. Plaintiffs

v.

Jorge SANTINI in his personal capacity and as Mayor of the Municipality of San Juan and the Municipality of San Juan Defendants

No. CIV. 03–1852CCC.

United States District Court,
D. Puerto Rico.

Jan. 24, 2005.

Roberto O. Maldonado–Nieves, Esq., San Juan, PR, for Plaintiffs.

Jorge C. Cruz–Jové, Esq., Francisco Amundaray–Rodríguez, Esq., San Juan, PR, for Defendants.

## ORDER

CEREZO, District Judge.

Before the Court are the Motions under Fed.R.Civ.P. 50 filed by defendants Municipality of San Juan (Municipality) and its Mayor, Jorge Santini–Padilla (Santini) on December 30, 2004 (**docket entry 84**) and by plaintiffs on January 5, 2005 (**docket entry 87**), with the respective oppositions filed on January 7, 2005 (**docket entry 89**) and January 14, 2005 (**docket entry 91**).

We first consider plaintiffs' motion. In essence, plaintiffs contend that judgment as a matter of law should be entered in their favor since the evidence presented at trial established the violation to their constitutional rights to freedom of expression alleged in the Amended Complaint (docket entry 39).

In a prior Order issued on December 8, 2004 (*see* docket entry 73), we described plaintiffs' action as one "alleg[ing] that their First Amendment freedom of expression was violated by defendants' actions which constituted an invalid prior restraint and suppression of their theatrical performance without compliance with any procedural requirements." Order, at p. 3. At the time, we noted that the Supreme Court had clearly established that "a system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system," that "because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint," and that "the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor ... and ... any restraint prior to judicial review can be imposed only for a specified brief period ... only for the purpose of preserving the status quo ... and ... a prompt final judicial determination must be assured." *Id.*, at p. 4 (quoting from *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975)). Given this governing legal standard, we, thus, recognized that "[t]he defendants, confronted with ... a claim [of invalid prior restraint], can allege and prove that the cancellation was unrelated to any prior restraint, for example, the lack of a valid contract, and/or that they complied with the necessary safeguards which validates their actions." *Id.*

We have now reviewed all the evidence presented by the parties during the trial, and note at the outset that not a single piece of evidence was presented by defendants seeking to show that they indeed had in place a mechanism for prior restraint of expression containing the minimum procedural safeguards required by the Supreme Court under the purview of the First Amendment. Dr. Fernando Gallardo, the Director of the Arts and Culture Department of defendant Municipality at the time of the events in controversy, admitted that much. *See* Transcript of Gallardo's testimony (docket entry 79), at pp.

57–59. The main issue now before us, then, boils down to a determination of whether there is no legally sufficient evidentiary basis for a reasonable jury to find that the cancellation of the play was not based on a prior restraint but due only, as averred by defendants, to a lack of a valid contract.

A summation of the relevant evidence follows. In early 2003, plaintiffs Raymond Gerena and Héctor Ulises Rodriguez applied for and obtained from the Municipality authorization to present at the Municipal Theater Alejandro Tapia y Rivera (Tapia) the play "Chicos Cantando y Desnudos" ("Boys Singing and Naked") from July 28 to August 31, 2003. *See* Joint Exhibit I. The Board of Directors of the Tapia (Board), which issued the authorization, inquired from the producers before issuing it about the nature of the play and they informed in a letter that it had been presented off Broadway as a musical and that it dealt with general issues regarding men's sexuality. Upon issuance of the Board's authorization, a contract was submitted to the producers for their signature, which they executed, together with the payment of the required retainer fee. Gallardo also signed the contract, although he declared that his signature was only meant as a recommendation to the Legal Advisor of the Municipality, Elsie Prieto, to authorize it since he understood she had the ultimate authority to do so.

Gallardo testified that later in the year he received calls at his office from people upset with the upcoming presentation of the play, and that calls were also received at the Mayor's office. A fax was also received at the Mayor's office from one religious group, "Pro Vida" ("Pro–Life")

complaining about promotion of the play given at a gay parade. Initially, Gallardo reacted to these calls by consulting the legal division of the Municipality on June 26, 2003 whether the play could be cancelled because it contained indecent exposures. He never received a response to this consultation, which the Legal Advisor of the Municipality later testified did not recall having received. Sometime in July 2003 Gallardo then called for an extraordinary meeting of the Tapia's Board of Directors, which he chaired, to discuss the matter. He also consulted outside counsel who advised him and the Board on the legal issues relating to prior censorship. After the Board's meeting, Gallardo met with the producers and obtained assurances from the latter that the play was an artistic presentation, not obscene, and that it would not offend the public. Gallardo specifically asked the producers if the play included a song about masturbation, as a friend who had seen the play at Broadway had previously informed him, which the producers denied.

On July 23, 2003, Dr. Gallardo wrote a letter to Coronel Adalberto Mercado, the Commissioner of the Municipality's Police, acknowledging what he described as expressions made by different religious organizations [1] that they intended to protest every day in which the play was to be presented at the Tapia because they considered it to be an attack against morality, and asking that municipal guards be posted at the Tapia to protect the actors, the public and the demonstrators. *See* Joint Exhibit II.

Gallardo further testified that shortly before the musical review's debut, then Puerto Rico Police Superintendent Víctor

---

1. During cross-examination, Gallardo identified one of those organizations as Morality in Media.

Rivera allegedly commented that he was going to place undercover agents in the theater to arrest any actor and/or spectator who exposed himself/herself. As a result of the Police Superintendent's expressions, Gallardo then asked Colonel Mercado and the Board members to attend the final rehearsal. The cast had been rehearsing at the Tapia for weeks before the Board's visit. After watching part of the rehearsal on July 31, 2003, Gallardo, Mercado and the Board members who were present gathered at the lobby and discussed what they had seen. The group expressed concerns about the play, and Mercado showed them several provisions of the Puerto Rico Penal Code which according to him the actors could be violating, making specific reference to the provision on indecent exposure. He recommended that the musical review not be allowed to be presented at the Tapia. That same night, all Board members then decided to stop the performance scheduled for the next day. Gallardo expressed that all the Board members, including him, thought that the play was a type of presentation that should be taken to another kind of theater since it was not proper for the Tapia.

Gallardo informed the Tapia administrator either that same night or early the following morning that the Board had decided to cancel the presentation because of the naked exposition of the actors. The producers were informed the following day, August 1, 2003 (when the play was supposed to debut) through a letter written by Gallardo. See Joint Exhibit III. In his letter of cancellation, Gallardo expressly states that the cancellation was based solely on the play's content.[2] The letter also states that while the Board recom-

mended to the Municipality's legal division of the immediate cancellation of the contract between the Municipality and the play's producers, said division only revoked its endorsement to the formalization of the contract since the same had not yet been signed by the legal representative of the Municipality.

A press release communicating the Municipality's decision was issued by Gallardo's office on August 1, 2003. In similar fashion to the letter sent by Gallardo to the producers, the press release states that after watching part of the play the Board met and "decided that the play places at risk the good name of the Tapia theater as one of the top theater halls of the country and decided not to recommend that the contract be granted." See Joint Exhibit IV. Gallardo testified that said press release was prepared during the morning, and that the person in charge of its preparation decided that it was not good to mention obscenity but it was better to make it "light and brief." Thus, reference was only made in the release to the good name and prestige of the Tapia and not to the discussion had by the Board, which led to the play's cancellation, on the possible violations to the Penal Code and the alleged indecent exposure of the actors.

Another press release was issued by the Municipality on August 1, 2003. (Joint Exhibit V). In this release, Mayor Santini reacted to expressions allegedly made by the producers. He is directly quoted as reiterating that the cancellation decision was taken by the Board in view of the complaints presented against the musical, and that the Board members after watching the performance had decided that it should not be presented at the Tapia. The

2. Gallardo wrote: "After watching various songs that are part of the theater play, the Board met and unanimously decided to re-

voke the endorsement thereof." Joint Exhibit III.

press release also quotes the Legal Advisor of the Municipality, Elsie Prieto, as stating that based on the laws and a then recent decision by the Puerto Rico Supreme Court there was no contractual relationship between the Municipality and any entity until the contract had been signed by the party authorized by the Municipality to contract and it was registered in the Office of the Comptroller, that the Board had recommended that the contract not be granted, and that there being no contract formalized between the Municipality and the producers they were barred from using the Tapia to present their play.

Elsie Prieto, the head of the legal division of the Municipality, declared that when she received the recommendation from Gallardo that the contract with the producers not be signed the same was still being evaluated by one of the attorneys who dealt with contracts at the division. She admitted, however, that other producers had held performances at the Tapia even when their contracts had still not been signed and registered at the Comptroller's Office. While this lack of signature and registration had not impeded other performances at the Tapia, Prieto affirmed that, in her view, the best practice was to have the contract signed and registered before the performance. Still, she explained that contracts signed and registered after the performance had taken place were considered to be retroactive contracts. She attested that had the cancellation of this play not occurred, the contract between its producers and the Municipality would have been validated retroactively as was the custom with regard to other contracts which were registered after the theatrical event took place.

 In light of all the evidence presented at trial bearing on the reasons that motivated the cancellation of the play, it seems plainly obvious to us that no rea-

sonable jury could find that said cancellation, just hours before its opening night, was unrelated to any prior restraint but instead due to lack of a valid contract. While it appears that the contract between the Municipality and the producers of the musical review was not perfected as required by law, the evidence established that on prior occasions this never impeded the presentation of plays as the Municipality's practice was to give contracts retroactive effect once all legal formalities were met. More importantly, however, the evidence conclusively established that the deficiencies raised at trial were not the reason for the cancellation of this play. Rather, the cancellation of "Chicos Cantando y Desnudos" was prompted by the nature of the performance linked to the fear of public protests from moralist activists. Gallardo started to get concerned about the play when complaints about its content reached his office. His initial meeting with the members of the Tapia's Board of Directors, the legal consultation with outside counsel, and the informal discussion with the producers, were all directed to assuage his concerns about the play's subject matter in light of mounting pressure by moralist groups. The subsequent attendance by most of the members of the Board to part of the play's final rehearsal, triggered by the continuing public controversy about the play's theme and the comments of the Police Superintendent that forecasted potential police intervention with actors and/or spectators, was plainly intended to evaluate its nature. The cancellation that followed was based strictly on the play's sexual content and had nothing whatsoever to do with any contractual deficiencies.

In sum, we are convinced that the allegation that contractual deficiencies prompted the cancellation of the play is simply pretextual, an after-the-fact at-

tempt to justify the prior restraint without constitutional safeguards in which the Municipality incurred when it did not allow the performance to go on as scheduled on August 1, 2003. It is evident that, had it not been for the play's cancellation by the Tapia's Board of Directors, based exclusively on its purported "obscene" content, it would had debuted on August 1, 2003, as scheduled, even though the contract between the Municipality and the play's producers had not yet been signed by the Municipality's legal representative, or been registered at the Comptroller's Office. We, therefore, FIND that the Municipality incurred in an unconstitutional prior restraint of expression when it canceled the play on August 1, 2003 without providing plaintiffs with any of the constitutionally required minimal-procedural safeguards that plaintiffs were entitled to.

We now turn to defendants' motion, which is premised on four main arguments: plaintiffs' lack of standing to bring their claims, the lack of municipal liability, plaintiffs' failure to establish damages warranting relief, and the nullity of the contract between plaintiffs and the Municipality. Although all of these contentions lack merit, we briefly pause to address them.

██ On the lack of standing based on the undisputed fact that plaintiffs never individually negotiated or executed a contract with the Municipality, suffice it to say that plaintiffs' claims do not sound in breach of contract. They are instead, as we explained above, based on the alleged infringement of their individual rights under the First and Fourteenth Amendment. *See* Amended Complaint (docket entry 39), at p. 11, ¶ 52.

██ With regard to the alleged failure by plaintiffs to establish municipal liability, it is undisputed that the decision to cancel the presentation was taken by the Board of Directors of the Tapia, a municipal entity, and no evidence was presented indicating that the Board lacked final authority to make such a decision. Quite to the contrary, the evidence portrayed the Board as having the authority to establish final municipal policy respecting the use of the Tapia.[3] Municipal officials who have "final policymaking authority" may by their actions subject the municipality to liability under 42 U.S.C. § 1983. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–84, 106 S.Ct. 1292, 89 L.Ed.2d 452(1986). In addition, to the extent defendants state that they failed to act with deliberate indifference to the constitutional rights of the plaintiffs, the evidence on record belies said assertion. After all, it was clearly established law by the time the Board cancelled the play that such an exercise of prior restraint of expression could not be undertaken without appropriate procedural safeguards. *See* Order dated December 8, 2004 and cases cited therein at pp. 3–4(docket entry 73). The Board was also apprised by counsel of such constitutional requirements, but still acted in absolute disregard of those constitutional principles.

Defendants also aver that since plaintiffs testified that they were paid in full the income and/or salaries initially guaranteed to them, and their "mental anguish and sufferings are not (sic) but a simple and passing affliction," defendants' Motion (docket entry 84), at p. 13, they are not entitled to an award of damages. We do not agree. The testimonies of plaintiffs Gerena, Rodriguez and Gil René–Rodrí-

---

**3.** Defendants acknowledge this fact in their Rule 50 motion (docket entry 84), at p. 18, where they state that: "The Board of Directors of the Tapia Theater had the empowerment to determine which plays were to be presented at the Tapia and which were not."

guez described in detail the efforts involved, people participating and time spent in the production of the musical review, which process started six months before the cancellation on opening night. René-Rodríguez explained that the production commenced with a meeting in New York City with the play's writer, Robert Schrock, in order to discuss modifications to the play to adapt it to the Puerto Rican public. All the proposed changes, which included the inclusion of Latin rhythms and variations of the song's lyrics, had to be submitted to Schrock for his approval. The auditions for the play's cast took several weeks, as some of the prospective actors had to be trained in singing and/or dancing. After the cast was selected, two months of four-hour daily rehearsals were conducted. Some of the actors also received vocal training. Gerena and Rodríguez also described how they received formal notification of the cancellation of the play during the afternoon of August 1, 2003,[4] although they had informally heard from the press that the show had been cancelled. While relief was sought from the courts, no favorable ruling was obtained on that date and all the performances scheduled for that first weekend, which were nearly sold out, had to be canceled. When injunctive relief allowing the presentation of the play was obtained from the local court, the performances were rescheduled for the following weekend at the Tapia. The Municipality, however, was successful in obtaining a stay of the court's order, and the rescheduled performances were also cancelled when the play was about to start-the actors were already in their dressing rooms and an audience was already waiting to enter the Tapia. After this second cancellation, the producers opted to move the play to El Josco Theater, also in San Juan. This was a much smaller location which required substantial adjustments in the play's scenography, lighting and in the choreography of the musical numbers. Its reduced seating capacity also required that an additional presentation be performed every night to accommodate those holding tickets already sold for the cancelled shows at the Tapia, although many of the patrons who had bought tickets for the Tapia opted to seek reimbursement for their tickets instead of watching the play at El Josco. The change of location and dates also required additional advertisement. Eventually, after the local courts upheld the injunctive relief initially requested, the play returned to the Tapia where it was presented on two occasions. Each of the plaintiffs also testified as to his/her particular involvement in the play's production and the individual investments of time and effort which said involvement required.

■ While it may be true that none of the plaintiffs needed medication or medical treatment to deal with the emotional distress and anguish caused by the play's cancellation, this is simply not enough to conclude that their distress amounted only to a "simple and passing affliction." The evidence indicates, instead, that they all undertook extensive preparations for the presentation of this musical review and that, when it was cancelled, they all suffered mental anguish in varying degrees. The degree of pain and emotional distress endured by each plaintiff and the reasonable compensation for said damages is, of course, for the jury to determine.

4. Their testimonies varied, however, on how they actually received formal notice. While Gerena testified that he first knew of the cancellation at 3:00 P.M. when Gallardo's letter was faxed to him, Rodríguez declared that he found out together with Gerena at the lobby of Gallardo's office when copy of his letter was handed there to their attorney.

Finally, defendants insist that no contract to lease the Tapia was ever executed with the Municipality since it was never signed by Prieto, the person authorized to do so, nor registered at the Comptroller's Office. We need not belabor this argument, as we have already concluded that this was merely a pretext used by the Municipality to legitimize the cancellation of the play when it was actually based on an unequivocal, prior restraint.

■ Having ruled on the parties' motions, some additional housekeeping is still in order. Our review of the evidence has convinced us that one of the plaintiffs, Nereida Acevedo–Pérez, simply failed to state a claim for the violation of her constitutional right to freedom of expression since she did not participate in the play's production as a producer, actor, or in any other backstage role which was an integral part of its presentation. She was the coordinator of ticket sales and no expression protected by the Constitution was ever implicated. Accordingly, partial judgment will be entered DISMISSING her claim.

■ Similarly, we see no reason for defendant Mayor Santini to remain as a defendant in his personal capacity in this case since there was absolutely no evidence presented which even suggested that he participated, procured, required, motivated or partook in any manner or form of the Board's decision to cancel the play. Gallardo testified that only once did Santini ask him about what was going on at the Tapia with the play, and Gallardo told him not to worry because it was "a play about men singing naked, and we can't do nothing about it." Tr. of Dr. Gallardo's testimony at p. 91. Santini made no comments to that response. There being no evidence showing that Santini was personally involved in the unconstitutional action taken against the plaintiffs, or establishing his supervisory

liability by linking any of his actions or omissions to the Board's decision, see generally Febus–Rodriguez v. Betancourt–Lebron, 14 F.3d 87, 91–92 (1st Cir.1994), partial judgment will also be entered DISMISSING plaintiffs' claim against him in his personal capacity.

We recapitulate. Partial judgment will be entered FINDING that the Municipality is liable to plaintiffs on their claims under the First and Fourteenth Amendment to the U.S. Constitution since it performed an unconstitutional prior restraint of expression when it canceled plaintiffs' play on August 1, 2003 without providing them with the constitutionally required procedural safeguards, and DISMISSING the claim of plaintiff Nereida Acevedo–Pérez and all of plaintiffs' claims against defendant Mayor Jorge Santini–Padilla in his personal capacity.

SO ORDERED.

## PARTIAL JUDGMENT

For the reasons stated in our Order of this same date, the Court FINDS that the Municipality is liable to plaintiffs on their claims under the First and Fourteenth Amendment to the U.S. Constitution since it performed an unconstitutional prior restraint of expression when it canceled their theatrical performance in the musical review "Chicos Cantando y Desnudos" at the Tapia Theater, a public forum under the Municipality's administration, without providing them with the constitutionally required procedural safeguards.

The claim of plaintiff Nereida Acevedo–Pérez and all of plaintiffs' claims against defendant Mayor Jorge Santini–Padilla in his personal capacity are DISMISSED.

SO ORDERED AND ADJUDGED.